**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**CENTRAL GULF LINES, INC., et al.,
Defendants-Appellants.**

**No. 84–3048.**

United States Court of Appeals,
Fifth Circuit.

Nov. 26, 1984.

---

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John J. Broders, New Orleans, La., for defendants-appellants.

John P. Volz, U.S. Atty., Roy F. Blondeau, Jr., Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before REAVLEY, POLITZ and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

The United States has recovered the value of loss of cargo carried by a ship of Central Gulf Lines, Inc. We affirm. 545 F.Supp. 1430.

Pursuant to the Food for Peace Program, 7 U.S.C. §§ 1721–1726 (1982), the United States, through the Agency for International Development (AID), entered into an agreement with the Cooperative League of the United States of America (CLUSA), a private cooperating sponsor. Under this agreement the Commodity Credit Corporation (CCC) was to ship soybean oil to CLUSA in India for distribution in that country. The CCC is a federal agency authorized to procure and export agricultural commodities. 15 U.S.C. § 714c (1982). The agreement between AID and CLUSA provided that "[t]itle to goods shall pass to CLUSA FAS vessel (i.e. ex-ships tackle), port of entry, India." In accordance with the agreement, CCC booked the soybean oil for passage to India on the S.S. Green Island owned by Central Gulf Lines, Inc. The bill of lading stated, in part, "COST TO DELIVER FAS VESSEL: $3,080,020."

When the S.S. Green Island arrived at Khandla, India, J.B. Boda Marine and General Survey Agencies Private, Ltd., an independent surveyor, was hired to conduct a survey at the discharge, as required by 22 C.F.R. § 211.9(c)(1)(i) (1984). The survey revealed that 54,128 pounds of soybean oil was missing.

The United States filed suit against Central Gulf to recover damages for the missing soybean oil. At the nonjury trial, the government's only witness was Thomas Bell, chief of Claims and Collection division of the Agricultural Stabilization Conservation service, contracting officer for the CCC, and assistant treasurer of the CCC. Bell testified that the CCC purchased the soybean oil from two private suppliers. In making such purchases, the CCC borrows the funds from the Treasury Department at a stated interest rate. At the end of the year, Congress appropriates sufficient funds to pay the CCC's deficit.

At trial, the government introduced numerous documents. Survey reports and a shortlanding certificate were introduced to establish that the 52,128 pounds of soybean oil was missing. A letter of protest was introduced to prove that proper notice had been given. Bell testified that he was the custodian of the survey reports, shortlanding certificate, and letter of protest.

The district court awarded the United States $24,717.82 plus costs and prejudgment interest at the rate charged by the Treasury Department to the CCC. *U.S. v. Central Gulf Lines, Inc.,* 545 F.Supp. 1430 (E.D.La.1983).

**1. Standing**

Central Gulf argues that because the bill of lading stated "FAS VESSEL," title to the soybean oil which was lost in India had passed to CLUSA when the oil was delivered to the S.S. Green Island in the United States. Central Gulf, therefore, contends that CLUSA is the proper party to sue and that the United States is without standing.

The federal regulation governing the transfer of food commodities under the Food for Peace Program provides: "Irrespective of transfer of title to the commodities, CCC shall have the right to initiate and prosecute, and retain the proceeds of, all claims against ocean carriers for cargo loss and damage or cargos for which CCC contracts for ocean transportation." 22 C.F.R. § 211.9(c)(2)(i) (1984). Therefore, the United States has standing to sue in this action.

Central Gulf attacks the regulation on a number of grounds. First, Central Gulf claims that the regulation is invalid

because it contradicts the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300–1315 (1982). Nothing in that Act, however, governs who has title to goods shipped by sea or who may sue to recover for lost goods. The regulation is not in conflict with the Act.

■ Next, Central Gulf argues that the Director of the United States International Development Cooperation Agency does not have the authority to promulgate the regulation granting standing. The authority for the regulation is derived from the Agricultural Trade Development and Assistance Act, 7 U.S.C. §§ 1691–1736n (1982), of which the Food for Peace Program is a part. The Act states:

> The President is authorized to determine requirements and furnish agricultural commodities, on behalf of the people of the United States of America, to meet famine or other urgent or extraordinary relief requirements; to combat malnutrition, especially in children; to promote economic and community development in friendly developing areas; and for needy persons and nonprofit school lunch and preschool feeding programs outside the United States.

7 U.S.C. § 1721(a) (1982); and

> The Commodity Credit Corporation may, in addition to the cost of acquisition, pay with respect to commodities made available under this subchapter costs for packaging, enrichment, preservation, and fortification; processing, transportation, handling, and other incidental costs up to the time of their delivery free on board vessels in United States ports; ocean freight charges from United States ports to designated ports of entry abroad; . . . and charges for general average contributions arising out of the ocean transport of commodities transferred pursuant thereto.

7 U.S.C. § 1723 (1982). The President delegated his functions under the Food for Peace Program to the Director of the United States International Development Cooperation Agency. Exec. Order No. 12,220, 45 F.R. 44245 (1980), *reprinted in* 7 U.S. C.A. § 1691 app. at 192–93 (West Supp. 1984).

■ Where a statute grants the executive branch the power to administer the statute, "the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660–61, 36 L.Ed.2d 318 (quoting *Thorpe v. Housing Authority,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969)). Here, the President is granted broad powers to administer the program. *See* 7 U.S.C. § 1721(a) (1982). Furthermore, the Act recognizes that the CCC must have broad authority to procure and transport commodities. *See* 7 U.S.C. § 1723 (1982). Certainly, standing to sue carriers for lost or damaged cargo is "reasonably related" to the CCC's functions of procuring and transporting commodities for distribution to needy countries.

Finally, Central Gulf argues that 22 C.F.R. § 211.4(b)(1) (1984) supports its position that the United States has no standing to sue. The regulation states:

> Unless the Food for Peace Program Agreement provides otherwise, title to the commodity shall pass to the cooperating sponsor at the time and place of delivery f.o.b. or f.a.s. vessels at the U.S. ports except that in the case of voluntary agencies and intergovernmental organizations, title may pass at the discretion of USDA at other points in the United States.

*Id.* This regulation addresses passage of title; it does not affect the United States' grant of standing regulation.[1]

---

1. Even if we agreed with Central Gulf that the standing regulation is invalid and title was dispositive, the United States would still have standing. The agreement between CLUSA and AID provides that "title to goods shall pass to CLUSA FAS vessel (i.e., ex-ships-tackle), port of entry, India." In other words, title passed at delivery in India. *See* U.C.C. § 2–319(2)(b) (1978); *see also T.J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338 (5th Cir.1980). Fur-

## 2. Admission of Documents

Central Gulf next appeals that the survey reports, the shortlanding certificate, and the letter of protest were inadmissible hearsay. Evidence introduced to prove merely that notice was given is not offered to prove the truth of the matter asserted therein and, therefore, is not hearsay. *United States v. Jefferson*, 650 F.2d 854, 858 (6th Cir.1981). Here, the letter of protest was admitted to prove only that notice of the claim had been properly given. The letter of protest was therefore properly admitted.

The public records exception to the hearsay rule allows the following to be put in evidence:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8). In other words, this exception applies if: first, the person making the record observed the matters contained in the record firsthand pursuant to a duty imposed by law; second, the record is prepared pursuant to a duty imposed by law; and third, the documents and surrounding circumstances indicate trustworthiness.

To satisfy the first element of Rule 803(8), the record sought to be admitted must be made from matters within the personal knowledge of the public official making the record or his agent or someone with a duty to report the matter to a public official. Rule 803(8) does not require a public official to make the record.

Here, federal regulations state, "[c]ooperating sponsors [e.g., CLUSA] shall arrange for an independent cargo surveyor [here, Boda] to attend the discharge of the cargo and to count or weigh the cargo and examine its condition." 22 C.F.R. § 211.-9(c)(1)(i) (1984). Also, the cargo survey re-

ports and shortlanding certificate were prepared by Boda surveyors who personally observed the matters stated therein. Therefore, the cargo surveys and shortlanding certificate were within the personal observation of those with a duty to report the matter to a public official, and the evidence satisfied the first element of Rule 803(8).

The second element of Rule 803(8), that the record be prepared pursuant to a duty imposed by law, is also satisfied in this case. As stated above, 22 C.F.R. § 211.-9(c)(1)(i) (1984) requires that the surveys and shortlanding certificates be prepared by an independent surveyor such as Boda.

Finally, the third element of Rule 803(8), indicia of trustworthiness, is also met in this action. Central Gulf has not provided any evidence or reason to believe that the documents are not trustworthy. To the contrary, the documents are originals and Boda had nothing to gain, and its reputation as a surveyor to lose, by falsifying the documents.

Central Gulf argues that the surveys and shortlanding certificate did not fall within the Rule 803(8) exception to the hearsay rule, because the documents were not authenticated. Central Gulf admits that the cargo certificates and shortlanding certificates are authentic under Rule 901(a) in that they are what their proponents claim. Central Gulf argues, however, that the documents are not authenticated under the Government Record Statute, 28 U.S.C. § 1733 (1982). Subsection (c) of the Statute provides that "[t]his section does not apply to cases, actions, and proceedings to which the Federal Rules of Evidence apply." 28 U.S.C. § 1733(c) (1982). Because the documents are admissible under Rule 803(8), the authentication requirements of the Government. Records Statute do not apply.

Central Gulf next argues that Bell was not the proper party to introduce the challenged documents. For purposes of Rule 803(8), the offering witness must be

thermore, CLUSA assigned any rights it might     have had to the United States prior to trial.

able to identify the documents as authentic and as made pursuant to a duty required by law. *See United States v. Newman,* 468 F.2d 791, 795–96 (5th Cir.1972), *cert. denied,* 411 U.S. 905, 93 S.Ct. 1527, 36 L.Ed.2d 194 (1973). At trial, Bell satisfied the requirements by testifying that he was the custodian of the documents, by properly identifying the documents, and by testifying that they were prepared pursuant to federal regulations.

### 3. Prejudgment Interest

■ In admiralty, prejudgment interest, although within the district court's discretion, should be awarded as a general rule. *Masters v. Transworld Drilling Co.,* 688 F.2d 1013, 1014 (5th Cir.1982). "Discretion to deny prejudgment interest is created only where there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest." *Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724, 728 & n. 3 (5th Cir.1980) (noting that prejudgment interest may be denied, for example, in cases involving genuine dispute over good faith claim in mutual fault setting, improper delaying tactics by claimant, laches, or estoppel).

■ Central Gulf claims that it is inequitable to award prejudgment interest in this case, because CCC intended to donate the soybean oil and did not replace the cargo. We cannot agree with Central Gulf. CCC suffered a loss inasmuch as it lost the use of the funds it had borrowed to purchase the missing soybean oil. Central Gulf cannot use CCC's humanitarian orientation to avoid damages otherwise properly awarded.

Furthermore, it was within the district court's discretion to set the rate of prejudgment interest at the rate that CCC paid to the Treasury Department. *See Sabine Towing and Transportation Co. v. Zapata Ugland Drilling, Inc.,* 553 F.2d 489 (5th Cir.1977), *cert. denied,* 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977).

AFFIRMED.