United States Court of Appeals,

Fifth Circuit.

No. 91–3789.

UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

CENTRAL GULF LINES, INC., etc., Defendant–Appellant, Cross–Appellee.

Oct. 9, 1992.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before VAN GRAAFEILAND,\*\* KING and EMILIO M. GARZA, Circuit Judges.

EMILIM. GARZA, Circuit Judge:

This appeal involves damage to famine relief cargo destined for East Africa.  The United States sought recovery against the carrier, Central Gulf Lines, Inc. ("CGL"), on 52 claims for cargo damage.  The district court entered judgment in favor of the United States on 37 of those claims in the amount of $3,092,344.51 plus prejudgment interest.  CGL appeals the judgment against it, arguing primarily that there was insufficient evidence establishing CGL's liability for damage to cargo.  The United States cross-appeals, contending that the district court (1) erred in holding that it did not have standing on four additional claims of cargo damage, and (2) applied an incorrect rate of prejudgment interest.

Finding sufficient evidence in the record to support the district court's judgment against CGL, we affirm.  The district court erred, however, by holding that the United States did not have standing to prosecute four of the claims of cargo damage.  Accordingly, we reverse that part of the district court's judgment and render judgment in favor of the United States on these additional claims.

I

In 1985 and 1986, pursuant to the Food for Peace Program, 7 U.S.C. §§ 1721–1726 (1988),

\*Senior Circuit Judge of the Second Circuit, sitting by designation.

the United States through its Commodity Credit Corporation ("CCC") donated famine relief food supplies to several humanitarian relief organizations operating in East Africa.[1] CGL carried approximately 76 shipments of the food supplies to Assab and Massawa, Ethiopia; Port Sudan, Sudan; and Djibouti.[2] CGL transported the cargo in lighter-aboard-ship ("LASH") vessels (mother vessels carrying barges laden with cargo).[3] In May 1985, CGL carried its first shipment of cargo to Assab, but did not have the necessary buoys to secure the LASH barges.[4] Another LASH vessel operator, Waterman Steamship Corporation,[5] however, allowed CGL to use its buoys temporarily. CGL eventually installed three of its own buoys. Although a proper buoy for LASH barge fleeting has an anchor and a heavy link chain to secure the barges and buoys, CGL used lighter equipment—concrete blocks and wires—to secure its fleeting.

Port authorities warned CGL in early May that Assab would face cargo congestion; nonetheless, CGL did not install any additional buoy systems until at least November 1985. Instead, CGL strung a large number of barges to the few buoys it had in the port, exceeding the number of barges that a buoy, whether attached by chain or wire, is designed to hold under windy conditions.[6] As a result of the overloading and inadequate anchoring of the buoys during the monsoon season, dozens of CGL LASH barges broke away from the buoys and floated aground or sunk. Independent surveyors were hired to conduct surveys at the discharge of cargo as required by 22 C.F.R. §

[1]The United States transferred formal title to the goods to the organizations. Many of the relief organizations then assigned all of their rights, title, and interest to the goods to CCC. *See* Record on Appeal, Exhibit No. P291.

[2]On appeal, most of CGL's claims concern shipments made to Assab, Ethiopia.

[3]CGL transported the cargo in LASH vessels instead of carrying the shipments in conventional cargo vessels. CGL made the decision to transport the cargo via LASH vessels, and neither the United States nor the relief organizations requested that the LASH vessels be used.

[4]After the LASH barges were unloaded from their mother vessels, CGL was responsible for providing proper fleeting equipment such as buoys.

[5]Waterman, a competitor of CGL at that time, is now a corporate affiliate.

[6]From around October to April each year, Port Assab is assailed by strong monsoon winds from the south and southeast.

211.9(c)(1)(i) (1992).[7]  The surveys showed that several shipments of cargo had been lost or destroyed.  Quarantine certificates, issued by foreign entities, also described shipments of cargo that had been damaged and that were therefore unfit for human consumption.

The United States filed suit consisting of 52 claims against CGL, *in personam,* and against two of the vessels that carried some of the shipments, M/V GREEN HARBOUR and M/V DEL MAR, *in rem,* to recover damages for lost or damaged cargo.  The district court entered judgment in favor of the United States on 37 of its claims in the amount of $3,092,344.51 plus prejudgment interest at the rate provided in 28 U.S.C. § 1961 (1988).  The district court dismissed without prejudice the claims against the two defendant vessels.

## II

CGL raises the following contentions on appeal:

(a) the district court erred in finding that the cargo at issue was damaged;

(b) the district court abused its discretion in admitting survey reports and quarantine certificates;

(c) the district court erred in holding that the United States established a prima facie case of cargo damage;  and

(d) the district court erred in holding that the United States had standing to pursue six claims for which it does not hold valid assignments.

## III

### A

CGL contends that the district court erroneously found that cargo was damaged while in CGL's possession.[8]  CGL argues that because the district court relied on survey reports and

---

[7]These independent surveyors included Gellatly, Hankey & Co. ("Gellatly, Hankey"), Afro Star Commercial Agency, and Adco.  The majority of the surveys in dispute, however, were prepared by Gellatly, Hankey.

[8]This argument consists of two components.  First, CGL argues that the district court's factual determination of damage was clearly erroneous because it is unsupported by documentary evidence.  Second, CGL contends that the survey reports and quarantine certificates establishing

quarantine certificates in determining the amount of cargo damaged, this Court should interpret the survey reports itself and not defer to the factual findings of the district court.  Findings based on documentary evidence as well as oral, in-court testimony are subject to review under the clearly erroneous standard.  *See* Fed.R.Civ.P. 52(a);  *Missouri Pac. R.R. Co. v. Railroad Comm'n of Tex.,* 948 F.2d 179, 181 n. 1 (5th Cir.1991) (under Rule 52(a), clearly erroneous review applies equally to findings based on documentary evidence and those based on oral, in-court testimony);  *McFarland v. T.E. Mercer Trucking Co.,* 781 F.2d 1146, 1148 (5th Cir.1986) (same).  Findings of fact are "clearly erroneous" when the appellate court, upon a review of the entire record, is "left with the definite and firm conviction that a mistake has been committed."  *Anderson v. Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948));  *United States v. Menesses,* 962 F.2d 420, 428 (5th Cir.1992).

For the discharge of cargo from each shipment, one or more independent surveyors were hired.  The surveyors prepared survey reports which detailed the type, amount, and condition of the cargo.  Many of the reports state that some of the food cargo was aboard barges that sunk and therefore was completely lost or that the food cargo was damaged by water that leaked through holes in the barges.  *See, e.g.,* Record on Appeal, Exhibit Nos. 563 & 575.  Several of the survey reports are corroborated by other documents, usually quarantine certificates.  *Compare* Record on Appeal, Exhibit No. P491 *with* No. P54 *and* No. P55.  Because the facts support the district court's findings, we hold that the district court's determination that the cargo had been lost or damaged was not clearly erroneous.

damage to cargo should not have been admitted into evidence.  We discuss the evidentiary issue separately.  *See infra* Part III.B.

      CGL also claims that the district court did not make findings of fact on sixteen of the damage claims.  *See* Brief for CGL at 26.  After reviewing the district court opinion, we conclude that the district court did make findings of fact on these claims.  *See* Record on Appeal, vol. 5, at 1464–65, 1471–74, 1475–79, 1492–98, 1502–07.

B

CGL also argues that the district court erred in admitting into evidence survey reports and quarantine certificates to support the United States' damage claims. CGL maintains that the documents are inadmissible hearsay because (1) they do not meet the requirements of the public records exception, Fed.R.Evid. 803(8)(C), and (2) they are not admissions by a party opponent. Fed.R.Evid. 801(d)(2)(D). The liberal construction that has been given Fed.R.Civ.P. 43(a) by this Court favors "admission of evidence rather than its exclusion if it is of probative value." *United States v. Lykes Bros. S.S. Co.,* 432 F.2d 1076, 1077 (5th Cir.1970). Therefore, generally, doubts should be resolved in favor of admissibility. *Id.*

We review the district court's admission of evidence only for abuse of discretion. *See United States v. Loney,* 959 F.2d 1332, 1340 (5th Cir.1992). We review the district court's findings of fact on these issues for clear error. *See* Fed.R.Civ.P. 52(a); *Missouri Pac. R.R. Co. v. Railroad Comm'n of Tex.,* 948 F.2d 179, 181 n. 1 (5th Cir.1991) (district court's determination that state regulation was preempted by federal statute not clearly erroneous because finding was plausible in light of entire record).

1

CGL contends that the survey reports and quarantine certificates were inadmissible hearsay because they did not fall within the public records exception. *See* Fed.R.Evid. 803(8)(C).[9] First, CGL argues the survey reports should not have been admitted because (1) the people who prepared the survey reports did not have personal knowledge of the matters reported, and (2) the survey reports indicate lack of trustworthiness. Second, CGL contends that the district court abused its

---

[9]Rule 803(8) provides:

> Public records and reports. Records, reports, statements, or data compilations, in any form, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

discretion in admitting the quarantine certificates because there is no law of the foreign nation requiring the keeping of such certificates.

Cargo survey reports are admissible pursuant to Rule 803(8)(C) provided that three requirements are met. *See United States v. Central Gulf Lines,* 747 F.2d 315, 319 (5th Cir.1984) ("*Central Gulf I* ").[10] First, the person making the report must have observed the matters contained in the report firsthand. Second, the report must be prepared pursuant to a duty imposed by law.[11] Third, the documents and surrounding circumstances must indicate trustworthiness. *Id.*

To satisfy the first element of Rule 803(8)(C), "the record sought to be admitted must be made from matters within the personal knowledge of the public official making the record or his agent or someone with a duty to report the matter to a public official." *Id.* CGL contends that none of the surveyors from Gellatly, Hankey who had prepared the reports had observed the matters within the reports.[12] CGL argues that both the witnesses who were deposed and those who testified did not know whether the persons who prepared the reports actually observed the matters within the report. We disagree. Goyton Aregai, a general manager in one of the Ethiopian offices of Gellatly, Hankey, testified that its surveyors were in attendance during the discharge of cargo. *See* Record on Appeal, vol. 7, at 63. In addition, Costas Athanassopolous, an employee of Waterman, testified that the

---

[10]The district court admitted the survey reports as public records under Rule 803(8)(C). In this appeal, CGL also relies on Rule 803(8)(C) to argue that the survey reports are not within the hearsay exception under the public records rule. In *Central Gulf I,* however, we held that survey reports are admissible as public records under Rule 803(8)(B). Rule 803(8)(B) provides a hearsay exception for public reports where "matters [are] observed pursuant to duty imposed by law as to which matters there was a duty to report." We find no significant difference between Rules 803(8)(B) and 803(8)(C). We also note that while the district court relied on Rule 803(8)(C) to admit the survey reports, it applied a test identical to the three-part test articulated by this Court in *Central Gulf I.*

[11]The second element of Rule 803(8)(C)—that the record be prepared pursuant to a duty imposed by law—is not in dispute. Independent surveyors such as Gellatly, Hankey are required under 22 C.F.R. § 211.9(c)(1)(ii) (1992) to attend the discharge of cargo and prepare reports detailing the quantity and condition of cargo.

[12]CGL also maintains that the witnesses at trial did not prepare the reports. Under Rule 803(8)(C), a document need not be attested by the preparer in order for it to be admissible.

surveyors were always present during the discharge of cargo.[13] *See* Deposition of Costas Athanassopolous at 9.

CGL further claims that the surveys themselves demonstrate that the preparers of the reports lacked personal knowledge of the matters contained in the reports. CGL bases its argument on the fact that some of the survey reports contain the language "said to be." These survey reports were, however, corroborated by quarantine certificates. *Compare* Record on Appeal, Exhibit No. P491 *with* No. P54 *and* No. P55. We hold that the survey reports were within the personal observation of those with a duty to report the matter to a public official, and therefore the evidence satisfied the first element of Rule 803(8)(C).

In order to satisfy the third element of Rule 803(8)(C), the reports offered must not indicate a lack of trustworthiness. The Advisory Committee Note to Rule 803(8)(C) offers a nonexclusive list of factors to be considered in determining the trustworthiness of such reports: (1) the timeliness of the investigation; (2) the experience of the official; (3) whether a hearing was held; and (4) possible bias when the reports are prepared in anticipation of litigation. *See,* 28 U.S.C. App. at 786 (1988); *see also Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 168 n. 11, 109 S.Ct. 439, 449 n. 11, 102 L.Ed.2d 445 (1988); *Koonce v. Quaker Safety Prods. & Mfg.,* 798 F.2d 700, 720 (5th Cir.1986). We review the district court's factual findings as to the adequacy of the survey reports for clear error. *See* Fed.R.Civ.P. 52(a); *Missouri Pac. R.R. Co. v. Railroad Comm'n of Tex.,* 948 F.2d 179, 181 n. 1 (5th Cir.1991).

---

[13]CGL also claims that employees, who were not qualified surveyors, often conducted the surveys during the discharge of cargo. Accordingly, CGL argues that the surveys should be inadmissible under Rule 803(8)(C) because the surveyors who signed the reports did not personally attend the discharge of cargo from LASH barges. As stated above, however, witnesses testified that surveyors were always present during the discharge of cargo.

CGL again claims that the surveys were not based on personal knowledge.[14]  As discussed above, however, there is sufficient evidence to support the district court's finding that the surveys were based on personal knowledge.  CGL also argues that the surveys failed to adequately record the cause, nature, and extent of damage.[15]  We find, however, that the surveys did contain information as to the type and condition of cargo on board the CGL's LASH vessels.  *See, e.g.,* Record on Appeal, Exhibits Nos. 489, 559, 575.

Finally, CGL argues that the surveys were biased because they were prepared in anticipation of litigation.  CGL did not, however, present evidence at trial establishing that any of the surveyors were government-owned or controlled.  Furthermore, there was no showing that any of the surveyors ever held any interest in CGL or any other carrier, in any of the consignees, in any of the cargo, or in any of the other aspects of the port operations.  Therefore, there is not evidence to indicate that the Gellatly, Hankey surveyors were biased.

Because there is sufficient evidence to support the district court's findings of fact with respect to the admission of the survey reports into evidence, we hold that those findings were not clearly erroneous.  Consequently, the district court did not abuse its discretion by admitting the survey reports under the public records exception of Rule 803(8)(C).

---

[14]CGL also claims that employees, who were not qualified surveyors, prepared some of the reports and therefore lacked the necessary experience.  We disagree because the evidence presented indicates that qualified surveyors were present during the discharge of cargo.

[15]Acknowledging that the "survey reports were not as detailed as those typically issued by American cargo surveyors," the district court rejected CGL's argument, stating that:

> As the CCC [Commodity Credit Corporation] itself recognizes, despite its aim and desire, it cannot always demand from these impoverished third-world nations survey reports that, through economic forces and regulation, would be considered [ ] adequate in more competitive and thriving ports and countries.

Record on Appeal, vol. 5, at 1466.

Further, the district court stated, "CGL never complained at the time about the method of accuracy that any surveyor was conducting his survey." *Id.* at 1466–67.

CGL also contends that the district court abused its discretion by admitting into evidence quarantine certificates. CGL argues that the quarantine certificates are hearsay and not within the public records exception, Fed.R.Evid. 803(8)(C), because there is no law of the foreign nation requiring the keeping of such records.

CGL's argument lacks merit because the quarantine certificates are admissible as public records kept by the CCC as a public agency of the United States government. As this Court stated in *United States v. Lykes Bros. S.S. Co.,* 432 F.2d 1076, 1077 (5th Cir.1970), "the duty to prepare the report can be delegated, under government regulations, to an independent agency or to a foreign government without the report losing its character when submitted through the appropriate United States agency, as a report of a department or agency of the United States." *Id.* at 1079 (condemnation certificate prepared by Korean officials admissible as government record).

We hold that the government quarantine certificates were admissible under Fed.R.Evid. 803(8)(C) under the same rationale and similar findings of trustworthiness as were made with respect to the survey reports; and that therefore the district court did not abuse its discretion in admitting the quarantine certificates.

2

CGL similarly contends that the survey reports were not admissible as admissions by a party opponent under Rule 801(d)(2)(B). We find, however, that the survey reports were also admissible as admissions by a party opponent.[16] A representative of Gellatly, Hankey met with a representative of CGL several times while Gellatly, Hankey was preparing survey reports concerning cargo on CGL's LASH barges. *See* Record on Appeal, vol. 7, at 58–59. In addition, CGL never objected to

---

[16]Rule 801(d)(2)(B) provides:

> Admission by a party-opponent. The statement is offered against a party and is ... (B) a statement of which the party has manifested an adoption or belief in its truth.

the survey reports prepared by Gellatly, Hankey. *See id.* Because there is sufficient evidence to support a finding that CGL adopted the statements made in the survey reports, the district court did not abuse its discretion in admitting the survey reports into evidence under Fed.R.Evid. 801. *See United States v. Loney,* 959 F.2d 1332, 1340 (5th Cir.1992).

C

CGL argues that it is exonerated from liability for the damage to the cargo under the governing substantive law, the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300–1315 (1988). CGL contends that port authorities and port conditions were responsible for the damage. In claiming that it is exonerated from liability, CGL relies on 46 U.S.C. § 1304(2)(q) (1988), the catch-all exception to liability under COGSA.

A prima facie case of cargo damage is established where the cargo was " "loaded in an undamaged condition, and discharged in a contaminated condition.' " *Quaker Oats Co. v. M/V Torvanger,* 734 F.2d 238, 240 (5th Cir.1984) (quoting *Socony Mobil Oil Co. v. Texas Coastal & Int'l, Inc.,* 559 F.2d 1008, 1010 (5th Cir.1977)). Once a prima facie case is established, a party may rebut the presumption by relying on § 1304(2)(q). Under § 1304(2)(q), "the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of its agents or servants of the carrier contributed to the loss or damage." 46 U.S.C. § 1304(2)(q) (1988). "The carrier's burden of establishing "his own freedom from contributing fault ... is no mere burden of going forward with evidence, but a real burden of persuasion, with the attendant risk of nonpersuasion.' " *Quaker Oats,* 734 F.2d at 241 (quoting Grant Gilmore & Charles L. Black, *The Law of Admiralty* §§ 3–37, 3–43 (2d ed. 1975)). As this Court stated in *Quaker Oats,* the carrier can rebut the prima facie case only where it "first prove[s] what th[e] "other cause' was." *Id.* at 243.

The parties stipulated in the pretrial order that all cargo was delivered to CGL in good order.

The government presented evidence that cargo was damaged or lost upon delivery. Therefore, the government established a prima facie case of cargo loss or damage. CGL attempts to rebut the prima facie case under § 1304(2)(q) by claiming that (1) it relinquished control of the cargo to port authorities, and (2) cargo congestion, flood, and related problems existing in Assab caused the cargo loss.[17]

First, CGL claims that it relinquished control of the cargo to Assab port authorities who allegedly had absolute duty and control over the port. CGL further alleges that the port authorities were responsible for the cargo damage because they did not provide enough space to discharge the barges and improperly secured the barges. There is evidence, however, that after unloading cargo from the mother vessels, CGL could instruct the port tug authorities as to the discharge of cargo, and that the port tugs would often follow CGL's instructions. *See* Deposition of Michael J. Mitchell at 166, 169–70. In addition, CGL independently made the decision to use LASH barges and buoys attached to rope, wire, and concrete blocks. *See* Deposition of M.K.R. Menon at 95. Accordingly, we find that CGL did not relinquish full control and responsibility to port authorities, and reject CGL's attempt to pass responsibility to port authorities. CGL also argues that the port authorities committed various acts which caused cargo loss. However, CGL only makes general claims of wrongdoing and fails to point out evidence of specific acts committed by the port authorities which caused specific damage to the cargo. *See* Brief for CGL at 33, 36–41.

Second, CGL attempts to absolve itself from liability by arguing that cargo congestion, flooding, and other related problems caused the cargo damage. CGL only discusses general port conditions and fails to point out evidence showing that the conditions were the specific cause of cargo

---

[17]CGL also argues that the district court erred by finding that the LASH vessels were unseaworthy. We do not review this finding because even if the LASH vessels were seaworthy, CGL fails to rebut the prima facie case of cargo loss by showing another cause of the cargo loss. In addition, CGL's argument focuses on the condition of the barges at the time they were loaded with the cargo. The district court's finding, however, was based on the unsuitability of LASH vessels for the prevailing conditions in Assab.

damage. *See* Brief for CGL at 33, 34–35. Because there is no evidence showing that some other cause was responsible for the damage to the cargo, the district court's finding that CGL did not rebut the United States' prima facie case of cargo loss was not clearly erroneous. We, therefore, affirm the district court's finding that CGL is responsible for the lost and damaged cargo.

## D

CGL also argues that the district court erred by finding that the United States had standing to pursue six claims of cargo loss.[18] CGL contends that the United States was barred from bringing those causes of action by the statute of limitations as set forth in 46 U.S.C. § 1303(6) (1988). Private parties, such as the relief organizations, have one year from the date of delivery to file a COGSA claim for cargo loss. *See* 46 U.S.C. § 1303(6). Where, as here, the United States asserts a claim on behalf of CCC, the United States is subject to the longer statute of limitations period of six years. *See* 15 U.S.C. § 714b(c) (1988). Because the United States could only receive rights possessed by the assignors at the time of the assignments, *see United States v. Currency Totalling $48,318.08,* 609 F.2d 210, 214 (5th Cir.1980), the private relief organizations must have had causes of action not barred by the statute of limitations when they assigned their rights to CCC. Therefore, for the United States to have standing, CCC must have received the assignments within one year from the date that the cargo was delivered.

CGL argues that, because six of the assignments that CCC received were undated, there is no evidence that CCC received the assignments within one year from delivery. Therefore, CGL argues that the United States is barred from bringing causes of action arising from those assignments. Under federal law, prescription is an affirmative defense. *See* Fed.R.Civ.P. 8(c); *Davis v. Huskipower Outdoor Equipment Corp.,* 936 F.2d 193, 198 (5th Cir.1991) (defendant waived statute-of-limitations defense by failing to raise it in pleadings). Because an affirmative defense places the burden of proof on the party pleading it, *see United States v. MMR Corp. (LA),* 907 F.2d 489,

---

[18]At issue are claim numbers 45, 47, 48, 50, 51, and 53. *See Brief for CGL* at 46.

499 (5th Cir.1990) (burden of proving the affirmative defense of withdrawal is on the defendant), *cert. denied,* ––– U.S. –––, 111 S.Ct. 1388, 113 L.Ed.2d 445 (1991); *Miranda v. National Transp. Safety Bd.,* 866 F.2d 805, 809 (5th Cir.1989) (pilot had burden of proving affirmative defense that "he moved aircraft to avoid a potential collision with another aircraft"), CGL had the burden to prove that the assignments were made more than one year after delivery of the cargo. CGL presented no evidence showing that the assignments were made after one year from the date of delivery. Because CGL merely argues that the lack of dates makes it unclear when the assignments were made, CGL fails to meet its burden of proof. The district court's finding that the United States had standing to pursue the six claims of cargo damage was not clearly erroneous.

## IV

The United States cross-appeals, contending that (a) the district court erred in holding that the United States did not have standing to pursue four claims, and (b) the district court erred in applying the rate of prejudgment interest provided in 28 U.S.C. § 1961.

## A

The United States contends that the district court erred by finding that the United States lacked standing on four claims of cargo damage.[19] The district court found that four of CCC's purported assignments were not executed and were therefore invalid because the assignments: (a) were unsigned; (b) were not on the cosignee's stationery; and (c) bore no seal or other identifying mark. Consequently, the district court concluded that the United States could not pursue claims on behalf of the CCC arising from the four assignments. The United States contends that it had standing because the assignments were valid.[20]

---

[19]At issue are claim numbers 37, 38, 39, and 40. *See* Brief for United States at 38.

[20]Because we find that the assignments at issue were valid, we decline to address the United States' argument that it had standing to pursue the four claims of cargo damage as a real party in interest.

A valid assignment may be made either orally or in writing. Restatement (Second) of Contracts § 324, at 37 (1981). Comment (a) of section 324 states that "aside from statute, the assignor of such a right may make an assignment by manifestation of intention without any particular formality." *Id.* One commentator states that "there is no required form in which an assignment for value must be made; all that is necessary is for the assignor so to express himself as to indicate an intention then and there to transfer his right to the assignee." 4 Arthur L. Corbin, *Corbin on Contracts,* § 879, at 528 (1951 & Supp.1991) (footnotes omitted). Thus, no formalities are required for an assignment to be valid. The district court, however, erroneously concluded that the assignments were invalid because of the lack of formalities. Therefore we reverse the district court's finding that the United States did not have standing on four claims of cargo damage.

B

The United States also contends that the district court erred by awarding prejudgment interest at the rate provided in 28 U.S.C. § 1961 (1988) rather than at the average Treasury bill rate over the period of time in question.[21] Under admiralty law, "the awarding of prejudgment interest is the rule rather than the exception." *Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026, 1028 (5th Cir.1986). Setting the rate of interest on a judgment is within the "broad discretion" of the district court. *Id.* at 1029 (no abuse of discretion where district court awarded prejudgment interest at rate provided in 28 U.S.C. § 1961). The district court is entitled to look to "the judgment creditor's actual cost of borrowing money or to other reasonable guideposts indicating a fair level of compensation." *Bosnor, S.A. De C.V. v. Tug L.A. Barrios,* 796 F.2d 776, 786 (5th Cir.1986). Where plaintiffs have failed to provide evidence that they had actually borrowed money and incurred higher interest costs, this Court has generally rejected plaintiffs' arguments that they should have been awarded prejudgment interest at a higher rate. *See, e.g., Bosnor,* 796 F.2d at 786 (no abuse of discretion in district court's award of prejudgment interest at 11%, where average interest rate for 3–month T-bills was 11.125% and average daily prime lending rate was 15.45%); *Gator Marine*

---

[21]CGL does not contest the United States' entitlement to prejudgment interest.

*Service Towing, Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1101 (5th Cir.1981) (no abuse of discretion where district court awarded prejudgment interest at 10%, and where plaintiff failed to show borrowing costs exceeded 10%). Finding no abuse of discretion, we hold that the district court did not err in awarding prejudgment interest at the rate provided in 28 U.S.C. § 1961 rather than at the average T-bill rate.

V

For the foregoing reasons, we AFFIRM the district court's judgment against CGL. We REVERSE, however, that part of the district court's judgment holding that the United States did not have standing on four additional claims of cargo damage, and render judgment in favor of the United States on these additional claims.