**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 97-20184
_____

U.N./F.A.O. WORLD FOOD PROGRAMME,

Plaintiff-Appellant,

VERSUS

M/V TAY, HER ENGINES, TACKLE, ETC.; ET AL.,

Defendants,

M/V TAY, HER ENGINES, TACKLE, ETC.; AFRICAN BULK SERVICES,
INCORPORATED,

Defendants-Appellees.

_____

Appeal from the United States District Court
For the Southern District of Texas
_____
April 9, 1998

Before DAVIS, JONES, and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Following a bench trial, the district court rejected most of
the U.N./F.A.O. World Food Programme's claims against Defendants
African Bulk Services, Inc. and the M/V TAY for loss and damage to
cargo. We affirm.

I.

The U.N./F.A.O. World Food Programme ("WFP") is the hunger
relief organization of the United Nations. In August of 1992, WFP
arranged with African Bulk Services, Inc. ("ABS") for the transport
of cargo to the coast of West Africa. At the time, ABS was the
bareboat charterer and operator of merchant vessels which

specialized in carrying humanitarian food aid to the West African coast. Previously, ABS had bareboat chartered the M/V TAY from its owner, Tropical Reef Shipping Ltd., to transport cargo to Africa.

Beginning in September of 1992, the M/V TAY loaded cargo destined for Africa in the Gulf Coast ports of Houston, Lake Charles, New Orleans, and Pensacola. This cargo consisted of rice, beans, corn-soya blend, and vegetable oil that the United States had donated as part of its world hunger relief efforts. WFP had arranged with ABS for the transport of this cargo to the ports of Lobito, Angola and Luanda, Angola. WFP issued non-negotiable liner waybills covering the shipment. These waybills incorporated by reference the Carriage of Goods by Sea Act ("COGSA"), 46 App. U.S.C. §§ 1300-1315. With its shipment of humanitarian aid, the M/V TAY sailed for the coast of Africa on October 7, 1992.

Around the time the TAY began taking on cargo in the United States, Angola began experiencing civil unrest associated with the country's first multiparty elections, which were being held after 16 years of civil war. This civil unrest escalated to such a point that it was no longer considered safe to discharge cargo in Angolan ports. On November 4, 1992, WFP's Director of Operations in Angola advised WFP's headquarters in Rome to stop all shipments to Angola. He warned WFP's headquarters that cargo would be looted or destroyed if discharged in Angolan ports. Two days later, the Director of Operations recommended that the TAY deviate to a port in Namibia. ABS, also concerned about the situation in Angola, alerted WFP to specific clauses in the waybills that entitled ABS, under the circumstances, to deviate to a safe port outside of

2

Angola to discharge the TAY's cargo. Eventually, ABS agreed to continue on to Angola if WFP would accept certain terms, including a "war zone" bonus for the crew, the purchase of special war risk insurance for the vessel, and demurrage for the additional days required to discharge at Luanda. WFP accepted ABS's terms and the parties agreed that the M/V TAY would discharge WFP's entire consignment at Luanda, Angola. After a stop in Freetown, Sierra Leone to discharge other cargo, the TAY anchored outside of Luanda on November 29, 1992.

The Luanda Port Administration, an agency of the Republic of Angola Ministry of Transport, operated the Port of Luanda. The port had three general cargo terminals with berths large enough to accommodate the M/V TAY. A different stevedoring company operated each of these terminals. Thus, the stevedore company assigned to work a ship's cargo depended upon the terminal to which the vessel was assigned. The Luanda Port Administration was vested with the authority to assign vessels to particular terminals and usually did so on the basis of the order of the arrival of each vessel.

Approximately five days after the TAY's arrival outside of the port, the port administration assigned the vessel to the cargo terminal operated by Secil Maritima ("Secil").[1] Before berthing, the port administration required ABS to pay a percentage of the pilotage, towing, and stevedoring services that would be incurred by the M/V TAY. The TAY's crew was warned not to leave the vessel

---

[1] The government of Angola owned 51% of Secil, and a private Danish company owned the remainder. Coincidentally, Secil Maritima also served as ABS's representative in Luanda. ABS had hired Secil in this capacity prior to the TAY's arrival in Luanda.

3

due to the fighting in the city.

Secil began discharging the TAY's cargo on December 4, 1992. On the second day of the unloading process, the ship's captain suspended the discharge operations for two hours because of damage and theft by Secil's stevedores. The ship's master also filed a written protest to Secil complaining of the damage. WFP filed a similar protest. None of these complaints had any effect and the damage and theft of cargo continued. During the unloading, several documented clashes occurred between Angolan "police" and Secil stevedores. Secil finished unloading the TAY on January 5, 1993.

WFP filed suit, alleging that Secil's stevedores pilfered and damaged a substantial part of the cargo during discharge. WFP alleged $298,607.38 in damages. WFP sought recovery against ABS and Tropical Reef Shipping, Ltd. (the owner of the TAY) *in personam* and the M/V TAY *in rem*. After a bench trial, the court entered judgment in favor of WFP in the amount of $8,765.20 for cargo damaged by ABS. However, the court ruled against WFP and in favor of ABS on the balance of WFP's claim. The district court found that delivery of the cargo was completed when the TAY's cargo hatches were opened because ABS no longer had control over the discharge. Relatedly, the district court also concluded that COGSA's "q" clause exonerated ABS from any liability. It is from this final judgment that WFP now appeals.[2]

## II.

---

[2] In the alternative, the district court concluded that even if ABS were liable for damage that occurred during discharge, WFP had failed to properly quantify its damages. WFP also contests this finding. However, because we can resolve this appeal on other grounds, we need not address the propriety of this ruling.

4

A.

The primary issue presented on appeal is whether the district court correctly held that ABS lost control of the unloading of the TAY's cargo, and, for that reason, ABS was not responsible for the actions of the stevedores in damaging the cargo. To consider this argument, we first briefly review the law of this circuit relating to the general duty of the carrier to discharge cargo and how this duty is affected when the carrier involuntarily loses control of the discharge.

B.

The Carriage of Goods by Sea Act governs "all contracts for the carriage of goods by sea to or from ports of the United States and foreign trade," provided that the contract of carriage is evidenced by a bill of lading or similar document of title. 46 App. U.S.C. §§ 1301(b), 1312; see also Mendes Junior Int'l. Co. v. M/V Sokai Maru, 43 F.3d 153, 155 (5th Cir. 1995). COGSA defines the rights and duties of the parties "from the time when the goods are loaded on to the time when they are discharged from the ship." 46 App. U.S.C. § 1301(e). One of the broad obligations imposed upon the carrier by COGSA is to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 App. U.S.C. § 1303(2). But as § 1304 makes clear, this duty is not absolute; section 1304 provides a number of exceptions to the above rule. If the carrier can establish one of these exceptions, it may exonerate itself from liability for loss or damage to cargo. 46 App. U.S.C. § 1304(2)(a)-(q); see GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY §§ 3-28 to 3-37, at

5

155-68 (2d ed. 1975). One of these exceptions provides that neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from "[a]ny other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier." 46 App. U.S.C. § 1304(2)(q)("q" clause).

The Harter Act, 46 App. U.S.C. §§ 190-196, obligates the carrier to provide "proper delivery," which has been defined to mean discharge of the cargo upon a fit and customary wharf. Metropolitan Wholesale Supply, Inc. v. M/V Royal Rainbow, 12 F.3d 58, 61 (5th Cir. 1994).[3] However, proper delivery may be modified by the customs and usage of the port. Tapco Nigeria, Ltd. v. M/V Westwind, 702 F.2d 1252, 1256 (5th Cir. 1983) (citing Allstate Ins. Co. v. Imparca Lines, 646 F.2d 166, 168 (5th Cir. Unit B May 1981)). As mentioned above, COGSA obligates the carrier to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 App. U.S.C. § 1303(2). Because COGSA and the Harter Act are so similar, one commentator has noted that it often makes no difference which statute applies. See 2A BENEDICT ON ADMIRALTY § 14, at 2-10 (7th ed. rev. 1997).

In Tapco Nigeria, Ltd. v. M/V Westwind, 702 F.2d 1252 (5th

---

[3] Notwithstanding other situations in which the Harter Act may apply, § 1311 of COGSA provides as follows:

> Nothing in this chapter shall be construed as superseding any part of [the Harter Act], or of any other law which would be applicable in the absence of this chapter, insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship.

Cir. 1983), and its companion case, All Commodities Supplies, Co., Ltd. v. M/V Acritas, 702 F.2d 1260 (5th Cir. 1983), we addressed the carrier's obligations to properly deliver and discharge cargo under COGSA and the Harter Act. In Tapco,[4] the carrier delivered a cargo of rice to Lagos, Nigeria during a period of civil unrest. Stevedores hired by the Nigerian Port Authority ("NPA") discharged the vessel. The NPA was an agency of the Nigerian government and controlled the loading and discharge of cargo in the Port of Lagos. The NPA hired all stevedores in the port and paid them according to NPA-established rates. The carrier had "no control over which stevedores [were] hired to discharge the vessel" and did not "participate in any way in the discharge." Tapco, 702 F.2d at 1254. During the discharge of cargo, the stevedores negligently damaged some of the cargo and also permitted various persons to pilfer the rice cargo. The vessel's chief officer protested the stevedores' handling of the cargo, but the protests had no effect. The chief officer also testified that in this atmosphere of lawlessness and unrest he feared for his life and decided not to interfere with the stevedores' operation of the ship's gear.

On appeal, we concluded that under the Harter Act the carrier "properly provided safe delivery to the farthest point that it could delivery [sic] the goods within the limitations of the law, custom, and usage of the port." Id. at 1258. We reasoned that "the government controlling the port had physically intervened in the discharge and delivery process" and had "demanded sole control

---

[4] The facts in All Commodities also involved cargo discharge in Lagos, Nigeria and are essentially identical to those in Tapco.

7

of an operation which otherwise would have been part of the ocean carrier's function of discharge and delivery." Id. at 1256. Furthermore, we concluded that under COGSA's "q" clause the carrier was not responsible for any losses caused by the stevedores during discharge. Id. at 1259-60. The carrier lacked any control over the actions of the stevedores and could not be responsible for their actions. Id. at 1260; see also Metalimport of Romania v. S.S. Italia, 426 F. Supp. 770 (S.D.N.Y. 1976) (holding carrier not liable under COGSA for damage to cargo caused by stevedores controlled by Romanian government and forced upon the carrier by regulation).

Thus, when the vessel owner loses practical control over the discharge of the cargo, as it did in Tapco and All Commodities, the shipowner is no longer responsible for the acts of the stevedore and the cargo is considered delivered when the ship's hatches are opened. See Tapco, 702 F.2d at 1260; All Commodities, 702 F.2d at 1263; see also 2A BENEDICT ON ADMIRALTY § 113, at 11-6 (7th ed. rev. 1997). This lack of practical control is ordinarily associated with a breakdown of law and order so that the carrier is powerless to prevent the unlawful or negligent conduct of the stevedores. United States v. Central Gulf Lines, Inc., 974 F.2d 621 (5th Cir. 1992), makes it clear that the carrier's lack of control over the stevedore is the critical factor. In Central Gulf, the owner of cargo brought suit against the carrier, Central Gulf Lines, for damage to famine relief cargo. The carrier argued, *inter alia*, that it should be exonerated from liability under COGSA's "q" clause because it had relinquished control of the cargo to port

8

authorities.  We rejected this argument because the record evidence demonstrated that Central Gulf exercised significant control and direction over the unloading of the cargo.  Id. at 629.  Thus, Central Gulf had not "relinquish[ed] full control and responsibility to port authorities" and was not entitled to exoneration from liability.  Id.

With this background, we now turn to the issues presented in this appeal.

C.

The primary issue presented to us is whether the district court correctly concluded that ABS lost control over the discharge of WFP's cargo so that the Tapco and All Commodities cases control the resolution of this appeal.

WFP argues first that the government of Angola did not intervene in the discharge of the TAY, and, therefore, that Tapco and All Commodities are inapplicable.  We find ample evidence to support the district court's contrary factual finding.  The uncontroverted evidence established that the Angolan government operated the Port of Angola through the Luanda Port Administration. The Dock Regulations and Port Tariffs vested control of the discharge process in the port administration.[5]  The Luanda Port

---

[5]  Article 2 provided as follows:

The commercial exploration of the ports inside their defined limits may only be effected by the ports administration personnel, thus all and any private, individual or collective activity, that is related to the handling of goods, loading and unloading of vessels and all and any operations related to the commercial utilization of the ports being prohibited, inside those limits,

9

Administration assigned vessels to particular terminals which were operated by designated stevedores. Pursuant to these regulations the Luanda Port Administration assigned the TAY to its berth. This assignment meant that Secil Maritima, an entity owned 51% by the Angolan government, was the stevedore designated to unload the TAY. The evidence supports the district court's finding that ABS had no influence over the selection of the terminal or the stevedore.[6]

The district court therefore did not err in finding that the government of Angola, through custom, regulation, and usage of the port, had intervened in the discharge and delivery process. The government of Angola appointed and controlled the stevedores that discharged the TAY's cargo. The government also set the rates which the stevedores could charge for services and issued the invoices for the stevedoring services incurred during the TAY's discharge. The district court was entitled to find that ABS, like the vessel owners in Tapco and All Commodities, (1) had no control

---

1. All work in the port shall be exclusively performed by port administration personnel against payment of the charges established.

2. It shall be granted, however, that where due to the work load or by authorization given in each case by the dock foreman, work may be performed by personnel and material pertaining to the interested parties or even third parties by payment of the charges established in the port tariffs for such purposes.

[6] While both parties concede that in certain instances the port authority could be swayed, at the direction of the carrier or its agent, to assign a particular vessel to a particular terminal, the evidence in this case indicates that ABS played no role in determining where the TAY would berth. Contrary to WFP's assertions that ABS may have influenced the TAY's assignment, the district court found that "the vessel had no control over the selection of the stevedore." This finding is supported by the record and is not clearly erroneous.

10

over the selection of the stevedores who would discharge the vessel and (2) lost control over the discharge of the cargo. The district court was therefore entitled to concluded that the cargo was delivered when the ship opened the hatches.

Furthermore, the district court did not err in concluding that ABS established the necessary facts to prevail under COGSA's "q" clause for the majority of WFP's claim. The district court did not err in finding that damage to the cargo caused by the stevedores occurred when the cargo was no longer in ABS's control and was without the actual fault, privity, or neglect of ABS or its agents. See Tapco, 702 F.2d at 1260; see also BENEDICT ON ADMIRALTY, supra, at § 113. Contrary to WFP's assertion that ABS had several means to control the discharge operations, the district court found that the "vessel lost all control over discharge operations." Once again, ample evidence supports the district court's finding in this respect. The TAY's crew complained daily of the damage and theft of cargo by the stevedores. The TAY's chief officer testified at trial that the stevedores ignored his directions and complaints and laughed at him. The chief officer complained verbally and in writing to Secil's supervisors about the stevedores' conduct, but these complaints fell on deaf ears.

The TAY's chief officer also testified that he was "scared" of the political situation in Luanda and voiced his concerns daily to a WFP representative on board the TAY. The crew heard constant gunfire from the battles between warring factions in the city of Luanda. Given the circumstances and the unrest in Luanda, the district court did not err in finding that the TAY's crew did all

11

that it could reasonably have done to protect the cargo.

WFP also argues that the TAY's crew had alternative means to control the Secil stevedores. WFP's representative in Luanda, Robert Sanchez, was on board the TAY at various times during the discharge. He testified at the trial that the crew could have exercised control over the stevedores by "intimidating" them with shows of force. Ordinarily, approximately 150 stevedores were aboard the TAY. Given the circumstances, the district court was fully justified in concluding that this tactic would not have been successful and that the crew was not required to follow this advice. WFP also argues that the crew could have shut off power to the ship's winches, closed the cargo hatches, and left the terminal until the situation was rectified. We answered a similar argument in Tapco: "[S]uch a contention ignores both the vessel's duty to deliver the cargo and the rule . . . that foreign law--here, the obligation to release the cargo to the stevedores chosen and employed by the Nigerian government--modifies the common law elements of proper delivery." Tapco, 702 F.2d at 1259. Also, the record evidence does not reveal that WFP's representative on board the TAY asked ABS to abandon the discharge effort.

D.

WFP raises a number of other arguments which we have considered and now reject. First, WFP argues that the agreement between ABS and WFP was a private contract of carriage under which the risk of proper unloading was allocated to ABS, thus superseding COGSA's general requirements. However, the evidence does not support this contention. The TAY routinely carried other

12

commercial and relief aid cargo for numerous shippers.  In fact, on the voyage in question the TAY was carrying cargo belonging to the Catholic Relief Service, in addition to WFP's cargo.  Therefore, the agreement between ABS and WFP was a common contract of carriage governed by COGSA.  See 2A BENEDICT ON ADMIRALTY § 23, at 3-3 (7th ed. rev. 1997).

WFP argues next that Clause 7 of the liner waybills, which provided that loading, discharge, and delivery of the cargo were to be arranged by ABS, allocated all risks of loss in unloading to ABS.  The district court rejected this argument, stating that the clause did not mean that ABS assumed "unconditionally all risks related to discharge operations."  We agree.  Clause 7 simply directed that WFP would arrange and pay for the stevedoring services at the port of discharge; it did not place any extra burden or risk on ABS above the carrier's general duties under COGSA and the Harter Act.

Finally, WFP argues that ABS assumed all risks of cargo loss occurring during unloading in Luanda because WFP received additional consideration for agreeing to discharge the cargo in Luanda.  This "consideration" consisted of war risk insurance for the vessel, demurrage for any additional days required to discharge at Luanda, and a "war zone" bonus for the crew.  The district court rejected this argument, finding that this contractual agreement only shifted the risk of loss from war to ABS and did not cover the risk of loss from damage or theft.  We agree with the district court's conclusion.  The renegotiated terms involved additional expenses associated with the TAY's call at Luanda.  The war risk

13

insurance only covered risks of loss to the vessel itself.  The demurrage payment and the war zone bonus were costs related to delays that the TAY could have experienced in calling at Luanda. By requesting these payments, ABS did not agree to assume all risks associated with the discharge of the cargo.

E.

The district court did award WFP $8,765.20 for the loss of cargo damaged by the collapse of a cargo stow in the vessel's number 2 hold.  This apparently occurred sometime during the voyage, before the discharge operation began.  Neither party challenges this award.

III.

For the above reasons, we conclude that the district court did not err in finding that the TAY lost control over the discharge operation once the cargo hatches were opened and that delivery was completed at that point.  It follows that ABS properly delivered the cargo to the farthest practicable point and is not liable for any damage or loss caused thereto by the government-controlled stevedores.  Based on the district court's finding that ABS could not exercise any practical control over the discharge process, the district court correctly concluded that ABS was not responsible for the actions of the stevedores under COGSA.  For the reasons stated above, we AFFIRM the district court's judgment in all respects.

AFFIRMED.