**Eric STEWARD, by his next friend and Mother, Lillian Minor, et al., Plaintiffs,**

v.

**Kyle JANEK, Executive Commissioner, Texas Health and Human Services Commission, et al., Defendants.**

**The United States of America, Plaintiff-Intervenor,**

v.

**The State of Texas, Defendant.**

**Civil No. 5:10-cv-1025-OLG**

United States District Court, W.D. Texas, San Antonio Division.

Signed May 20, 2016

Casey A. Burton, Robert Velevis, Yvette Ostolaza, Sidley Austin LLP, Dallas, TX, Deborah A. Dorfman, Elizabeth F. Toner, Sandra J. Staub, Steven J. Schwartz, Northampton, MA, Garth A. Corbett, Disability Rights Texas, Austin, TX, Sean A. Jackson, Disability Rights Texas, Houston, TX, for Plainttiffs.

Andrew S. Oldham, Andrew Bowman Stephens, Angela V. Colmenero, Marc Edward Rietvelt, Michael James Patterson, Nancy K. Juren, Thomas A. Albright, Office of The Attorney General, Austin, TX, John Earl Duke, Natalee B. Marion, Texas Attorney General Office, Austin, TX, for Defendants.

Alexandra L. Shandell, Benjamin Ogle Tayloe, Cynthia Coe, Haley Christine Van Erem, Jessica Elyse Polansky, Regan Rush, Robert A. Koch, U.S. Department of Justice, Washington, DC, John F. Paniszczyn, U.S. Attorney's Office, San Antonio, TX, for Plaintiff-Intervenor.

## ORDER

ORLANDO L. GARCIA, CHIEF
UNITED STATES DISTRICT JUDGE

Before the Court is Plaintiffs' Second Amended Motion for Class Certification (docket no. 174). The Court has reviewed this motion, together with the parties' supporting memoranda, responses, replies, and notice of supplemental authority (docket nos. 238, 249, 262, 270, 279). The Court has also reviewed the transcript of the oral arguments offered by counsel during the hearing on class certification and other issues that was held on September 12, 2012 (docket no. 142). After reviewing the parties' arguments and the evidence submitted in support thereof, in light of the applicable law, the Court concludes that Plaintiffs' motion should be GRANTED for the reasons set forth below.

### Background

Plaintiffs are twelve individuals and two organizations, The Arc of Texas, Inc. and the Coalition of Texans with Disabilities, Inc. Defendants are the State of Texas, and, in their official capacities, Texas Health and Human Services Commission Executive Commissioner Kyle Janek and Texas Department of Aging and Disability Services Commissioner Jon Weizenbaum. Plaintiffs allege that Defendants are in violation of Title II of the American with Disabilities Act (ADA), the Rehabilitation Act, the Medicaid Act, and the Nursing Home Reform Amendments Act (NHRA). Plaintiffs are joined by Plaintiff-Intervenor the United States.

Plaintiffs seek the certification, under Fed. R. Civ. P. 23, of a class consisting of:

all Medicaid-eligible persons over twenty-one years of age with intellectual or developmental disabilities or a related condition in Texas who currently or will in the future reside in nursing facilities, or who are being, will be, or should be screened for

admission to nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.112 et seq.

Docket nos. 174 at 10; 249 at 18 n. 15.[1] Defendants raise several evidentiary arguments, docket no. 262 at 6-10, and argue that Plaintiffs fail the commonality requirement of Fed. R. Civ. P. 23(a)(2), id. at 23, and the typicality requirement of Rule 23(a)(3), id. at 42; that the named Plaintiffs will not fairly and adequately protect the interests of the class as required by Rule 23(a)(4), id. at 45; that class certification should be denied because classwide injunctive relief is not appropriate within the meaning of Rule 23(b)(2), id. at 47; and that class certification should be denied because the proposed class is not adequately defined or clearly ascertainable, id. at 52. Defendants also raise the same challenges to standing that they previously asserted in their motion to dismiss Plaintiffs' claims. Id. at 54; docket no. 244 at 23-30.

### Legal Standards and Analysis

#### I. Evidentiary Issues

##### A. Admissibility of Plaintiffs' Declarations

█ The Court first addresses Defendants' evidentiary arguments. As they did in their motion to dismiss, Defendants argue that Plaintiffs' declarations should be excluded because, rather than being declared "under penalty of perjury ... true and correct[,]" they are declared "under penalty of perjury ... true and correct to the best of [the declarant's] knowledge." See, e.g., docket no. 249-3 at 4; see also 28 U.S.C. § 1746. Defendants also reassert their argument that declarations submitted by counsel for Plaintiffs and legal personnel employed by the organizational Plaintiffs should be excluded because they were submitted in violation of Rule 3.08 of the Rules of the State Bar of

---

1. Throughout their briefing, the parties have used the phrase "intellectual or developmental disabilities or a related condition," abbreviated as "IDD," in place of the phrase "mental retardation or related condition," which does not have a substantially different meaning but which has been replaced in most legal provisions. Docket nos. 244 at 3 n.12; 249 at 18 n. 15; Medicare and Medicaid Program; Regulatory Provisions,

Final Rule, 77 Fed. Reg. 29022 (May 16, 2012). Like the parties, the Court uses the abbreviation "IDD" throughout this Order to refer to "intellectual or developmental disabilities or a related condition" which includes "intellectual disabilities" as defined at 42 C.F.R. § 483.102(b)(3), and "related conditions" as defined at 42 C.F.R. § 435.1010.

Texas. The Court finds these arguments to be without merit and declines to exclude Plaintiffs' declarations from consideration on either basis.

■ Plaintiffs' declarations are not ineffective under 28 U.S.C. § 1746 because, notwithstanding the qualifying phrase to which Defendants object, they still subject the declarants to the penalty of perjury. *Cf. Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir.1988) ("affidavit is not in substantial conformity with either formula because, as drafted, it allows the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods"); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge"). The declarations also do not violate the Rules of the State Bar of Texas. The declarations submitted by Plaintiffs' named counsel, Garth Corbett, fall well within the exception established in that rule for testimony that "relates to an uncontested issue" or that "will relate solely to a matter of formality [about which] there is no reason to believe that substantial evidence will be offered in opposition to the testimony[.]" Tex. R.P.C. Rule 3.08(a)(1), (2), cmt.5. The Corbett declarations relate to the authentication of the exhibits supporting Plaintiffs' motions for class certification. Docket nos. 97, 249–3. The Marino and Sanchez declarations also relate primarily to undisputed matters such as the residential history, medical diagnoses, and desire for community-based placement of the individual Plaintiffs. Docket nos. 249–4, 249–5. To the extent that the Marino declaration contains assertions of fact without predicate or hearsay regarding the treatment and residential history of some individual Plaintiffs, Defendants' objections are unavailing because the substance of the challenged testimony also appears in the non-hearsay declarations previously submitted by those individual Plaintiffs.[2] *See* docket

nos. 264-1 (Joe Morrell); 264-2 (Johnny Kent); 264-3 (Thomas Johnson).

## B. Admissibility of Expert Reviewer Reports

■ Next, Defendants challenge Plaintiffs' use of three reports prepared by Expert Reviewer (ER) Kathryn du Pree, arguing that such use is prohibited by an agreement between the parties. The role and duties of the ER are set forth mainly in the parties' Interim Settlement Agreement (IA) (docket no. 180), which provides for the State's retention of an ER jointly agreed to by the parties. The parties contemplated that the ER would assist them with developing outcome measures for the State's obligations under the IA and preparing periodic reports on the State's progress toward meeting those outcome measures. Docket no. 180 at 14. The parties' agreement provided that "the State will work collaboratively with the Expert Reviewer but will share drafts of documents with Plaintiffs and the United States." *Id.* at 15.

After the selection of Kathryn du Pree as the parties' ER, the parties developed and sent du Pree a one-page document captioned "Protocol for the *Steward* Litigants' ex parte Communications with the Expert Reviewer(s)[.]" Docket no. 231–3. This protocol provided that the ER was to refrain from disclosure of information that a party requested her to hold in confidence and stated that "[t]he ER may not be used as a witness (including as a consulting or testifying expert) by either party concerning matters related to work performed, or information obtained, as an ER under the IA." *Id.* This is the provision that Defendants now claim prohibits the Court from considering the ER's three reports in evaluating Plaintiffs' compliance with Rule 23. Defendants also raise cursory hearsay and *Daubert* objections to the ER Reports.[3]

---

**2.** The sole exception appears to be Leonard Barefield. Defendants object to Marino's testimony, at paragraphs 28, 30, 31, and 32 of his declaration, regarding Barefield's residential and treatment history, on the grounds that it lacks a factual predicate in light of Marino's testimony that he has advocated on behalf of Johnson, Kent, and Morrell for approximately eight months preceding the date of the declaration.

Docket no. 249–4 at ¶ 1. Notably, however, Marino's testimony regarding the duration of his advocacy on behalf of Barefield contains no such limitation. *Id.* at ¶ 2.

**3.** Defendants note that Plaintiffs have not retained or disclosed du Pree as an expert witness, and briefly state hearsay and *Daubert* objections in conditional terms—"[i]f Plaintiffs are offering

As discussed below, Plaintiffs have produced sufficient evidence independent of the ER Reports to meet their burdens under Fed. R. Civ. P. 23 and to show that class certification is appropriate. Although the Court's class certification ruling does not depend upon consideration of the ER Reports, the Court is not persuaded by Defendants' arguments and, for the following reasons, declines to exclude the ER reports at the class certification stage.

First, the reports in question are not offered as evidence of the merits of Plaintiffs' claims, but to support their class certification motion. At this stage—at least arguably—the rules of evidence do not apply in full force.[4] The purpose of the ER Reports is to provide an independent expert assessment of the very questions at the heart of the class certification analysis: particularly, whether the purportedly unlawful characteristics of Defendants' PASRR [5] process impact large numbers of Texans. As such, the ER Reports are of great value to the Court at the class certification stage. Although Defendants argue that Plaintiffs have misconstrued the ER Reports, they do not attack their substance or make any showing that consideration of the reports would unfairly prejudice them. The Court sees little value in excluding such useful material, particularly where the both parties have agreed to the ER's qualifications to render her findings and no party disputes their substance.

Second, even assuming full applicability of the rules of evidence, Defendants' hearsay argument fails. The parties appear to agree that the ER reports in question are public records of the Texas Department of Aging and Disability Services, are subject to public FOIA requests, are discoverable in this litigation, and are required by the parties' IA to be disclosed to all parties even independent of their discovery obligations. Docket nos. 180 at 15; 262 at 10 n.25; 270 at 8-9. Defendants argue that the ER Reports are hearsay, but do not explain why the reports would not fall within the scope of Fed. R. Evid. 803(8), which creates an exception to the rule against hearsay for certain public records. *See United States v. Cent. Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir.1984). The reports were prepared based on du Pree's firsthand observations, in the course of a duty to report created by the parties' IA and the state's appointment of du Pree as ER, and the circumstances surrounding the report indicate du Pree's qualifications and independence in general and the trustworthiness of these reports in particular.[6] *See Cent.*

... [the ER Reports] as proof at this time[.]" Docket no. 262 at 11. Aside from a single citation in this sentence to *Daubert* and Fed. R. Evid. 801 and 802, Defendants do not explain their *Daubert* objection to the integrity of the work prepared by du Pree—whom they subsequently retained to assist them in reforming the very processes at issue in this case. Docket nos. 232–1 at 3; 232-2 at 2; *see Ryals v. Am. Airlines, Inc.*, 553 Fed. Appx. 402, 406 (5th Cir.2014) ("A litigant's failure to provide legal or factual analysis results in waiver of the related claim or argument.") (internal quotation marks omitted).

4.  *See, e.g., Flores v. Anjost Corp.*, 284 F.R.D. 112, 124 n. 3 (S.D.N.Y.2012) ("While there has not been any direct attention on this issue from the circuit courts of appeals, most district courts addressing this question have held that evidence need not be admissible under the Federal Rules of Evidence—or that the rules should not be applied strictly—on a motion for class certification."); *Anderson Living Trust v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 377 (D.N.M.), *adhered to on reconsideration*, 312 F.R.D. 620 (D.N.M.2015) ("In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.");

*Ancar v. Murphy Oil, U.S.A, Inc.*, No. 03–1923, 2007 WL 3270763, at *1 (E.D.La. Nov. 2, 2007) ("A full review under *Daubert* is not suitable to class certification proceedings."); *but cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ("The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. ... We doubt that is so[.]").

5.  As used throughout this Order, "PASRR" refers to the "Pre-Admission Screening and Resident Review" program mandated by 42 U.S.C. § 1396r(e)(7).

6.  The Fifth Circuit has noted that Rule 803(8) "is designed to permit the admission into evidence of public records prepared for purposes independent of specific litigation [,]" *United States v. Quezada*, 754 F.2d 1190, 1194 (5th Cir.1985), and the reports at issue here were a product of the parties' efforts to settle this litigation. However, there are sufficient circumstantial indications of reliability present here to justify the application of the public records exception or, alternatively, to admit the reports under the residual

*Gulf Lines, Inc.*, 747 F.2d at 319 (Rule 803(8) "applies if: first, the person making the record observed the matters contained in the record firsthand pursuant to a duty imposed by law; second, the record is prepared pursuant to a duty imposed by law; and third, the documents and surrounding circumstances indicate trustworthiness."). Admission of the reports under Rule 803(8) also lends weight to Plaintiffs' argument that use of the ER Reports at this stage does not violate the parties' agreement, because "[n]o foundational testimony is required in order to admit evidence under Rule 803(8)." *United States v. Vidacak*, 553 F.3d 344, 351 (4th Cir.2009); *United States v. Doyle*, 130 F.3d 523, 546 (2d Cir.1997) (quoting *United States v. Regner*, 677 F.2d 754, 761 (9th Cir.1982)).

Finally, as noted above, the bulk of Defendants' arguments against admitting the ER Reports are not actually arguments about the reports but about Plaintiffs' interpretation of them. Defendants' argue that Plaintiffs have misinterpreted the reports both by overstating findings of Defendants' failure to meet the outcomes and outcome measures discussed in the report, and by equating those failures with noncompliance with federal law. These arguments are unavailing because "general complaint[s] that the reports are incomplete and inaccurate are matters going to the weight of this evidence and not its admissibility." *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir.1991). These arguments also misstate the purpose for which Plaintiffs offer the ER reports. An expert opinion regarding the ultimate merits questions would be of little use to the Court at the class certification stage since the Court reaches merits questions only to the extent that they overlap with the class certification analysis. *Wal–Mart*, 564 U.S. at 351, 131 S.Ct. 2541; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 317–18 (3d Cir.2008), *as amended* (Jan. 16, 2009). Rather, the ER reports are useful primarily because they document a nexus between a large group of Texans with IDD and the challenged aspects of Defendants' IDD service system. Furthermore, although the outcome measures developed by the parties and applied by the ER may not be entirely identical with the pertinent requirements of the federal law, many of them, as discussed below, are closely analogous to their federal law counterparts.

For these reasons, the Court rejects Defendants' evidentiary arguments, and declines to exclude Plaintiffs' declarations or the reports prepared by the parties' ER. The Court now turns to the substance of the class certification analysis.

## II. Class Certification

The party seeking class certification bears the burden of proving that they have met the requirements for class certification set forth in Fed. R. Civ. P. 23. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996). First, they must satisfy the four prerequisites for class certification set forth in Rule 23(a): that "the class is so numerous that joinder of all members is impracticable;" that "there are questions of law or fact common to the class;" that "the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Second, they must establish that they meet at least one of the three requirements set forth in Rule 23(b). In this case, Plaintiffs contend that they meet the requirement set forth in Rule 23(b)(2), that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"

hearsay exception found in Fed. R. Evid. 807. Specifically, the parties' IA provided that the ER "will be independent and will not be a current employee of any Party." Docket no. 180 at 14. Defendants do not dispute du Pree's independence or qualifications, and indeed the Department of Disability and Aging Services, following the expiration of the parties' IA, has contracted with du Pree to conduct annual reviews related to the State's provision of services to individuals with intellectual or developmental disabilities. Docket nos. 232–1 at 3; 232–2 at 2.

## A. Rule 23(a)(1): Numerosity

■ Fed. R. Civ. P. 23(a)(1) requires plaintiffs seeking class certification to show that "the class is so numerous that joinder of all members is impracticable." Plaintiffs' evidence shows that the proposed class would number in the thousands, and Plaintiffs argue that, because of their numbers and their geographic distribution, these individuals could not be joined in this litigation. Docket no. 249 at 30; *see also Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir.1980) (listing "geographic dispersion" among the factors that determine the practicability of joinder). Plaintiffs also argue that joinder is impracticable because some class members, because of their poverty, disabilities, and isolation in institutional settings, face barriers to obtaining counsel or otherwise vindicating their interests in access to community-based care and relief from discrimination. Docket no. 249 at 30 (citing *Rolland v. Cellucci*, No. CIV A 98–30208, 1999 WL 34815562, at *3 (D.Mass. Feb. 2, 1999) ("Considering plaintiffs' confinement, their economic resources, and their mental handicaps, it is highly unlikely that separate actions would follow if class treatment were denied.")). Finally, Plaintiffs argue that joinder is impracticable because some potential class members— Medicaid-eligible adults with IDD who have not yet been, but may in the future be, screened for admission to a nursing facility— cannot presently be identified. Docket no. 249 at 31; *see also Phillips v. Joint Legislative Comm. on Performance & Expenditure Review of State of Miss.*, 637 F.2d 1014, 1022 (5th Cir. Unit A Feb. 1981) (joinder of unknown individuals is "certainly impracticable" and satisfies Rule 23(a)(1)).

Plaintiffs' evidence supports these arguments. Plaintiffs have submitted a FOIA response in which the Department of Aging and Disability Services (DADS) reported that 5765 persons were administered PASRR screenings between September 1, 2005, and August 31, 2009. Docket no. 97–1 at 2.[7] Plain-

tiffs have also produced a data compilation prepared by the U.S. Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) in 2010 in which it reported that 4520 individuals with mental retardation or developmental disabilities reside in Medicaid-funded nursing facilities in Texas. Docket no. 97–2 at 2.[8] Plaintiffs have also submitted third-party reports, discussed in greater depth below, that describe a population of thousands with IDD who are institutionalized in facilities across Texas. *See generally* docket nos. 249-3 at 14-72 (the May and September 2015 Expert Reviewer Reports), 102-86 (2014 Texas Disability Report). Defendants do not challenge Plaintiffs' numerosity showing. In light of the evidence that Plaintiffs have produced, the Court concludes that Plaintiffs have satisfied the numerosity prerequisite for class certification.

## B. Rule 23(a)(2): Commonality

■ Rule 23(a)(2) imposes a requirement for class certification that "there are questions of law or fact common to the class[.]" The purpose of this requirement is to determine whether "maintenance of a class action is economical and whether the named plaintiffs claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"; in short, whether "all their claims can productively be litigated at once" such as to justify a departure from "the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart*, 564 U.S. at 349 & n. 5, 131 S.Ct. 2541. "[F]or purposes of Rule 23(a)(2) even a single common question will do[.]" *Wal–Mart*, 564 U.S. at 359, 131 S.Ct. 2541 (internal alterations and quotation marks omitted).

■ For class certification to be appropriate, there must be more than a claim of classwide injury flowing from a defendant's violation of a particular law. The claims at issue must "depend upon a common conten-

---

7. Plaintiffs report that, after providing that figure, DADS reduced its estimate, and reported that it believes that approximately 4000 Texans with IDD are confined in nursing facilities. Docket no. 249 at 6 n.5.

8. Plaintiffs have indicated that these figures are based on the most recent data available from CMS in this report series. Docket no. 249 at 6 n.5.

tion[,]" which must, in turn, "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart*, 564 U.S. at 350, 131 S.Ct. 2541; *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 844 (5th Cir.2012) ("[m]ere allegations of systemic violations of the law ... will not automatically satisfy Rule 23(a)'s commonality requirement[.]"). In the course of this analysis, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, —— U.S. ——, 133 S.Ct. 1184, 1195, 185 L.Ed.2d 308 (2013) (citing *Wal–Mart*, 131 S.Ct. at 2552, n. 6). Defendants contend that Plaintiffs have failed to meet the commonality requirement of Fed. R. Civ. P. 23(a)(2) with respect to each of their claims. The Court does not agree.

■ There are several common questions of law that are evident from the parties' arguments. One arises from Plaintiffs' "Specialized Services" claim under 42 U.S.C. § 1396r(e)(7)(B)(ii), and has to do with the scope of the specialized services requirement and the "active treatment" standard imposed at 42 C.F.R. § 483.440. Defendants contend that the active treatment standard applicable to nursing homes is limited to the services described in paragraph (a)(1) of 42 C.F.R. § 483.440. *See, e.g.*, docket no. 142 at 23-25, 82-84. Plaintiffs contend that the standard includes the services described in subsections (b) through (f) of that section. *See, e.g.*, docket no. 142 at 42-44, 121. The resolution of this question of law will drive the resolution of the classwide specialized services claims. Since Plaintiffs contend that the unlawful limitation of the specialized services provided to nursing home residents with IDD equates to an unreasonable delay of those services, resolution of this question will also drive

resolution of the classwide "Reasonable Promptness" claim under 42 U.S.C. § 1396a(a)(8). And, since the denial of specialized services in institutional settings is one component of Plaintiffs' discrimination claims, resolution of this question will also drive classwide resolution of those claims.

Plaintiffs' "Freedom of Choice" claim under 42 U.S.C. § 1396n(c)(2)(B) and (C) points to another common question of law. Plaintiffs contend that the assessment and notice required by 42 U.S.C. § 1396n(c)(2)(B) and (C) must be administered before the individual's enrollment in a nursing facility. Docket no. 142 at 52-57. Meanwhile, Defendants contend that this assessment and notice is required only at the time that an individual is being evaluated for enrollment in a waiver program to receive community-based services. Docket no. 142 at 19-21, 87-88. The resolution of this question of law will drive the resolution of the classwide freedom of choice claim. Plaintiffs allege that the failure to divert individuals with IDD from nursing home care is a driver of the discrimination that they allege, and that failure to provide timely and adequate information about community-based alternatives to institutional care is a policy that drives this failure. Accordingly, resolution of this common question will also resolve one aspect of the classwide ADA and Rehabilitation Act claims.

■ Another common question of law arises directly from Plaintiffs' discrimination claims. Plaintiffs allege that, when they sought community-based services through the Home and Community-based Services waiver program, they were relegated to a years-long, slow-moving waiting list, while non-IDD Medicaid recipients seeking similar services were able to access those services without any such waiting period. This allegation raises a common question of whether this scheme of administering the HCS waiver program waiting list violates Title II of the ADA and the Rehabilitation Act.[9]

9. Defendants do not appear to defend the legality of this arrangement, but have discontinued this practice and fault Plaintiffs for continuing to refer to it, complaining that "[a]lthough Plaintiffs are fully aware of this fact [i.e., that this practice has been discontinued], they have nonetheless

refused to amend their pleadings to correct th[is] false allegation." Docket no. 262 at 49 n.85. However, as Plaintiffs have noted, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the

Several common questions of fact are evident from the record as well. In their attempt to settle this case, the parties jointly selected an Expert Reviewer (ER) who assisted the parties in developing measurable outcomes and outcome measures designed to gauge Defendants' efforts to satisfy Plaintiffs' claims by coming into compliance with the terms of the parties' Interim Agreement (IA). Although the parties' purpose in developing these measures was to establish metrics for their progress towards settlement, those outcomes and outcome measures also function as concise statements of the factual determinations upon which Plaintiffs' claims turn. In other words, insofar as they mirror the relevant federal standards that determine the lawfulness of Defendants' conduct, they are statements of some of the common issues of fact in this case—questions whose answers, the parties have agreed, will drive the resolution of this litigation.

For instance, outcome 1 assessed whether "[i]ndividuals in the target population will be appropriately identified, evaluated and diverted from admission to nursing facilities." Docket no. 249–3 at 70. This question relates to Plaintiffs' NHRA "Screening, Assessment and Placement" claim, which alleges that Defendants' PASRR process fails to timely and adequately screen nursing home applicants to determine whether their needs could be met in an alternative, less restrictive setting, and, if so, to divert them from institutionalization. *See* 42 U.S.C. § 1396r(b)(3)(F)(i), (e)(7)(B)(ii) (prohibiting admission of mentally ill residents to nursing facilities unless "the State mental retardation or developmental disability authority [has] review[ed] and determine[d] ... whether or not the resident, because of the resident's physical and mental condition, requires the level of services provided by a nursing facility or requires the level of services of an intermediate care facility[.]"). Since Plaintiffs allege that the State's inadequate PASRR process drives its violations of the *Olmstead* integration mandate by failing to identify candidates for community-based care and divert

them from unnecessary institutionalization, this common question also relates to Plaintiffs' ADA and Rehabilitation Act claims. And, since Plaintiffs allege that the defects in Defendants' PASRR process delayed or denied them access to medically necessary services, this question also relates to the classwide reasonable promptness and specialized services claims. Defendants argue that the deficiencies of their PASRR process are not capable of classwide assessment because the deficiencies will manifest as the failure to identify different medical conditions in different individuals and will therefore contribute to the denial of different specialized services to different individual class members. This argument is unavailing. The State may fail individual class members in unique ways, but the harm that the class members allege is the same: denial of specialized services, violation of their right to reasonably prompt care, and unnecessary institutionalization in violation of the ADA and Rehabilitation Act. Moreover, although the State's failures may be unique to each individual class member, the failures can also be quantified and remedied by the Court in ways that are common across the class. Do Defendants achieve a timely administration of PASRR screenings? *See* 42 C.F.R. § 483.112. Classwide, do Defendants ensure that PASRR assessments comply with the relevant minimum data needs and process requirements? *See* 42 C.F.R. § 483.136. Classwide, do Defendants ensure the creation of individual program plans and meet the related implementation, monitoring, and documentation requirements? *See* 42 C.F.R. § 483.440(c)-(f).[10]

Similarly, outcome 2 assessed whether "[i]ndividuals in the Target Population in nursing facilities will receive specialized services with the frequency, intensity, and duration necessary to meet their appropriately—identified needs, consistent with their informed choice." Docket no. 249–3 at 70. This outcome presents a common question that relates to Plaintiffs' "Specialized Services" claim under 42 U.S.C. § 1396r(e)(7). *See* 42

practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). (internal quotation marks omitted).

10. As discussed above, this question relates to a common question of law: Are Defendants required to enforce the creation of individual service plans for nursing home residents with IDD?

C.F.R. § 483.120(a)(2) ("specialized services means the services [that] ... result[ ] in treatment which meets the requirements of § 483.440(a)(1)"); 42 C.F.R. 483.440(a)(1) ("Each client must receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services[.]"); *id.* at (d)(1) ("each client must receive a continuous active treatment program consisting of needed interventions and services in sufficient number and frequency to support the achievement of the objectives identified in the individual program plan."). Since Plaintiffs allege that many of them have not received specialized services timely or at all, this common question also relates to their "Reasonable Promptness" claim under 42 U.S.C. § 1396a(a)(8). And, since Plaintiffs allege that the failure to provide specialized services has degraded their ability to live and receive care in a community-based setting, this common question also relates to their *Olmstead* claim.

Outcome 3 assessed whether "[i]ndividuals in the Target Population in nursing facilities who are appropriate for and do not oppose transition to the community will receive transition planning, transition services, and placements in the most integrated setting necessary to meet their appropriately identified needs, consistent with their informed choice." Docket no. 249–3 at 70. This question relates to Plaintiffs' "Freedom of Choice" claims under 42 U.S.C. § 1396n(c)(2)(B) and (C), and since Plaintiffs allege that the failure to adequately inform them about community-based alternatives to suitable institutional care was a driver of unnecessary institutional segregation, it also relates to their ADA Title II and Rehabilitation Act claims.

Outcomes 5 and 6 also reflect a specific component of the specialized services requirement: the right to individual program plans, developed and implemented by an interdisciplinary team and periodically updated; plans that, *inter alia*, are "organized to reflect a developmental progression appropriate to the individual"; "[d]escribe relevant

interventions to support the individual toward independence"; and "[i]nclude opportunities for client choice and self-management." 42 C.F.R. § 483.440(c). Outcome 5 assesses whether "[i]ndividuals in the Target Population who do not refuse service coordination will receive coordination from trained service coordinators with the frequency necessary to meet the individual's appropriately-identified needs, consistent with their informed choice." Docket no. 249–3 at 71. Outcome 6 assesses whether "[i]ndividuals in the Target Population will have a service plan, developed by an interdisciplinary service planning team through a person-centered process that identifies the services and supports necessary to meet the individual's appropriately—identified needs, achieve the desired outcomes, and maximize the person's ability to live successfully in the most integrated setting consistent with their informed choice." *Id.*

As to each of these common questions of fact, there is ample evidence in the record to make the commonality showing under the standard described in *Wal–Mart.* In its 2014 Texas Biennial Disability Report (the "Biennial Report"), the Texas Council for Developmental Disabilities and the Texas Office for Prevention of Developmental Disabilities [11] reached findings consistent with Plaintiffs' allegations. For instance, the Biennial Report found that, because Texas relies more heavily on institutional care than most other jurisdictions, "Texans with I/DD do not receive services within the least restrictive settings appropriate to their needs." Docket no. 249–3 at 159. The Biennial Report further found that the low service utilization rate in Texas compared to the national average indicates that "individuals with developmental disabilities do not receive services with reasonable promptness." Docket no. 249–3 at 135. The Biennial Report noted signs that demand for community-based care already exceeds current resources and stressed the likelihood that Texas's population growth will correspond to a growth in the need for community-based IDD services, commenting that lengthy interest lists for community-based care programs "mean that individuals who

---

11. As noted in the record, this biennial report to the legislature on the state of services to persons

with disabilities in Texas is mandated by state law. Docket no. 249–3 at 105.

need community services are not receiving them." Docket no. 249–3 at 163, 178. In order to reduce the "risk for negative health outcomes, crisis, and unnecessary institutionalization[,]" the Biennial Report recommended that Texas "rebalance the system that services persons with I/DD by expanding cost-effective policies that honor the choices of individuals to live in the most integrated setting to meet their needs, and transferring savings to serve more persons with disabilities in their communities." Docket no. 249–3 at 163, 178.

Similarly, the Administrator's Statement submitted by the Department of Aging and Disability Services to the 84th Texas Legislature in 2015 commented that "[d]emand for [community-based] services outpaces available funding" and that "about 113,000 [aging or disabled] individuals are on interest lists and can wait as long as 11 years for required assistance." Docket no. 249–3 at 188. The Administrator's Statement discussed the Department's ongoing efforts "[t]o fully comply with federal statutory expectations set out in the 1999 Olmstead litigation," and linked that effort with requests for increased funding to "enhance[e] community IDD services" and funding for the Administration's "effort to comply with federal Preadmission Screening and Resident Review (PASRR) requirements [.]" Docket no. 249–3 at 190.

The link between a deficient PASRR process and unnecessary institutionalization, denial of specialized services, and failure to provide reasonably prompt care was also drawn by the Civil Rights Division of the U.S. Department of Justice in a findings letter sent to Texas shortly before the United States sought intervention in this case. Docket no. 97–10. Specifically, the DOJ findings letter noted that "The United States completed a thorough investigation into the allegations contained within the Plaintiffs' complaint filed in *Steward v. Perry*[,] [and] determined that the State of Texas unnecessarily institutionalizes individuals with developmental disabilities[.]" Docket no. 97–10 at 1. The DOJ investigation found that, because of an approximately nine-year waitlist, individuals confined in institutional settings and those living in the community at risk for

institutionalization are unable to access Texas's Home and Community-based Services Program. Docket no. 97–10 at 1. The DOJ investigation also drew the link between unnecessary institutionalization and ineffective screening of individuals with IDD confined in, or facing admission to, nursing facilities, and found that the individual Plaintiffs in this case "exemplify the consequences of a systemic and widespread problem." Docket no. 97–10 at 2.

The deficiencies documented in the Biennial Report and the DOJ findings letter were also documented nearly a decade ago in a report on PASRR compliance prepared by the Department of Health and Human Services Office of Inspector General in January 2007 (the "OIG Report"). The OIG Report found widespread deficiencies in PASSR processes in surveyed states, including the failure to timely complete PASRR Level 1 screens and the widespread failure to complete PASRR Level II evaluations. Docket no. 97–3 at 9-13. Taken alone, the findings of the OIG Report have little evidentiary weight because they are dated, based on a small sample size of nursing facility resident files, and are not specific to Texas. Docket no. 97–3 at 5-6 & tbl.1. Nonetheless, in conjunction with the evidence summarized above, the OIG Report suggests that Texas's difficulties with operating a compliant PASRR process are longstanding.

The deficiencies noted in the OIG Report, the DOJ findings letter, the Biennial Report, and the Administrator's Statement are echoed in the anecdotal accounts of the individual Plaintiffs in this case. For instance, several of the individual Plaintiffs claim that the unnecessary institutional segregation and deprivation of specialized services that they suffered resulted, at least in part, from an inadequate PASRR process that failed to consistently detect their intellectual or developmental disabilities. *See, e.g.*, docket nos. 173 at ¶¶ 150, 155-56, 165-66, 182, 195-96, 200, 210-11, 223, 229-30, 233, 247-48, 258-60, 268-69, 283-84, 296, 308-10, 322-23, 337-38, 352-53, 369-70; 264-1 at ¶ 10; 264-2 at ¶¶ 12-14; 264-3 at ¶ 17; 264-4 at ¶ 16-18. Several of the named Plaintiffs allege or have produced evidence that, at the time of their admission to

institutional care settings, they were not provided with information about community-based alternatives to institutional care. *See, e.g.,* docket nos. 173 at ¶¶ 168, 198, 212, 234, 238-39, 253, 263, 273, 288, 298, 313, 328, 343, 359, 374; 264-1 ¶¶ 6, 7, 9; 264-2 at ¶¶ 6-10; 264-3 at ¶¶ 8-12; 264-4 at ¶¶ 7, 9-14; 264-5 at ¶¶ 8-10. Several Plaintiffs also claim that, even when they discovered and pursued community-based services through the state's HCS waiver program, they spent years— and, in some cases, more than a decade—on a lengthy HCS waiting list containing more than 45,000 names. *See, e.g.,* Docket no. 173 at ¶¶ 67-68, 157, 167, 175, 177-78, 197, 237, 252, 257, 262, 297, 312, 327, 342, 358, 373.

Additionally, three of the named Plaintiffs have produced more personalized accounts of the harm they allegedly suffered at the hands of Texas's deficient service system. Docket no. 98. In her report, Plaintiffs' expert Karen Green Mc Gowan finds that Defendants' PASRR screening assessments failed to accurately document the medical needs of Andrea Padron, Linda Arizpe, and Eric Steward. Docket no. 98 at 5, 8-9, 12-13. Mc Gowan's report provides lengthy and detailed explanations of her findings that, as a result of the defective PASRR process, these three individuals were subjected to medically unjustified institutionalizations and were denied specialized services. As to Ms. Arizpe, Mc Gowan found that she "has not had timely and appropriate evaluations to identify her service needs" and has "therefore[ ]not been provided with the necessary specialized services to meet her needs and prevent regression." Docket no. 98 at 9. Similarly, as to Mr. Steward, Mc Gowan found that "Eric has received no adequate PASRR screening assessment or evaluations, and consequently the services that Eric needs have not been properly identified [and] ... he has not been provided the specialized services that he requires to meet his habilitative needs or prevent regression." Docket no. 98 at 13. As to Ms. Padron, McGowan found that "Because Andrea has not received adequate PASRR assessments ... she has been deprived of the specialized services that she desperately needs[;] [a]s a result, Andrea's physical con-

dition has significantly and irreparably deteriorated since her admission to [the nursing facility where she resided]." Docket no. 98 at 5.

Mc Gowan's report also documents the medical deterioration that followed these institutionalizations and denials of specialized services, and she opines that a properly functioning service system would have prevented these medical deteriorations. In the case of Ms. Padron, Mc Go wan writes that "[d]ue to excessive periods of lying in bed without the requisite specialized services, including physical therapies, Andrea has ... developed flexion contractures and is now no longer able to straighten her wrists, ankles, or shoulders[,] [and] can also no longer straighten her legs or hips." Docket no. 98 at 6. Mc Gowan found that, also as a result of Ms. Padron's prolonged confinement in bed without physical or other therapies, "Andrea has lost significant range of motion in her spine [and]. ... is developing kyphoscoliosis" (a spine deformity condition that can lead to "pneumonia or other serious lung infections ... loss of lung function and death"). Docket no. 98 at 6. Mc Gowan found that "when Andrea was admitted to [the nursing facility where she lived for the nine years preceding Mc Gowan's report], she could stand upright in a stander[,] [but] [n]ow, due to not getting the necessary specialized services and lying idle in bed almost continuously, Andrea can no longer stand upright with the assistance of a stander or other device." Docket no. 98 at 7. Mc Gowan concluded that, unless Ms. Padron is afforded "specialized services that include a 24-hour physical management program" "Andrea will likely die of preventable conditions ... associated with her lying in bed continuously for 164-166 hours per week."[12] Docket no. 98 at 7.

In the case of Ms. Arizpe, Mc Gowan found that, because "Linda spends most of her time in her bed and does not receive necessary therapeutic physical management interventions," she has developed a leg deformity that interfered with her ability to sit in a traditional sitting position and a diminished

---

12.  Slightly less than two years after Mc Gowan's visit, Ms. Padron died. The cause of Ms. Padron's death is not identified in the record. Docket no. 185.

range of motion in her left hip. Docket no. 98 at 9. Mc Gowan offered her opinion that "development of this deformity ... was preventable had Linda been afforded the appropriate physical therapy with the appropriate equipment" and that Ms. Arizpe's leg deformity could be corrected if she received a therapy described by Mc Gowan and administered by a physical therapist. Docket no. 98 at 10. Mc Gowan also offered her opinion that "[t]here is a very serious risk that, absent the provision of the necessary specialized services, Linda will be vulnerable to further physical deterioration and exacerbation of her already existing deformity as, well as social withdrawal." Docket no. 98 at 11.

In the case of Mr. Steward, Mc Gowan found that, as a result of inconsistent and inaccurate PASRR Level I screens, and an absence of PASRR Level II screens, "Eric is not receiving necessary specialized services to prevent regression in [the seizure disorder he has had since childhood]." Docket no. 98 at 13. Mc Gowan also found that Mr. Steward had been diagnosed, possibly erroneously, with "psychosis" and "dementia," and had received no treatment for a weight gain that likely led him to develop gastro-esophageal reflux disease, and placed him at risk for metabolic disorder, type II diabetes, and other conditions. Docket no. 98 at 13, 14. Mc Gowan offered her opinion that, in addition to a physical therapy assessment, Mr. Steward requires specialized services in the form of "vocational training and supported employment services, in order to allow him to work. ... [and] regain some of his independence and participate in the community." Docket no. 98 at 15. Finally, Mc Gowan warned that, if Mr. Steward does not receive these necessary specialized services, his physical deterioration will continue, his seizure disorder will further impair his mobility, and his capacity to work and live independently will atrophy. Docket no. 98 at 15-16.

13. As Plaintiffs stress, the improvements in Defendant's PASRR process and IDD service delivery system, presumably attributable to the State's PASRR redesign and the parties' IA, do not deprive Plaintiffs of standing or the Court of jurisdiction to determine the legality of the practices Plaintiffs challenge in their complaint. *See* docket no. 249 at 11 n.8; *see also Friends of the Earth,*

Mc Gowan's report and the declarations of the individual Plaintiffs provide evidence of the causal links between Defendants' challenged policies and the unnecessary institutionalization, denial of specialized services, and other harms that Plaintiffs allege flowed from those policies. The Biennial Report, Administrator's Statement, DOJ findings letter, and—to a lesser extent—the OIG Report provide evidence that the individual Plaintiffs' personal experiences are in fact common to thousands of other Texans with IDD who have suffered similar harms as a result of the same widespread practices in Texas's IDD service system. This evidence is sufficient to satisfy Plaintiffs' commonality burden under the standard set forth in *Wal-Mart.*

Plaintiffs' commonality showing is further reinforced by the ER reports. Plaintiffs have submitted three reports created by the ER: A September 2015 review of PASRR Level II evaluations of 198 individuals determined to not have IDD (the "PASRR Level II Review"); a May 2015 report on the IA's Quality Service Review (the "May QSR Report"); and a September 2015 report on the Quality Service Review (the "September QSR Report"). These three reports documented some improvement in the integrity of the State's PASRR process and service delivery system following Defendants' May 2013 and June 2014 PASRR redesign, but also identified several lingering deficiencies that are relevant to Plaintiffs' claims.[13] The PASRR Level II Review found that only 67 of 193 PASRR Level II evaluations returning a negative finding for IDD had sufficient information to verify that negative finding, and only 85 of those 198 evaluations had been completed within seven days of the first-level screenings. Docket no. 249-3 at 7; *see* 42 C.F.R. § 483.136 (describing "minimum data needs and process requirements" to assess the need for "a continuous specialized services program"); *see also* 42 C.F.R. § 483.112

*Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") (internal quotation marks omitted).

("a preadmission screening determination must be made in writing within an annual average of 7 to 9 working days of referral of the individual ... to the State mental health or intellectual disability authority").

In the September QSR Reports, the ER noted "a lack of specialized services identified during the PASRR Level II evaluation or by the [Service Planning Team]" and that service plans do not usually include "meaningful goals and objectives that reflect the assessments, needs, preferences and choices of the individual." Docket no. 249–3 at 44-45; see 42 C.F.R. § 483.440 (c)-(f) (describing the procedural and substantive requirements for individual program plans). Both the May and September QSR Reports found that nearly half of the PASRR Level II evaluations failed to assess whether the needs of those identified to have IDD could be met in a community care setting, and, if not, to identify the specialized services they needed while in an institutional setting. Docket no. 249–3 at 20, 48 (Outcome Measure 1-3); see 42 C.F.R. § 483.112(a)-(b) ("State mental health or intellectual disability authority (as appropriate) must determine ... whether ... the individual requires the level of services provided by a NF" and, if so, the appropriate State authority "must also determine ... whether the individual requires specialized services ... as defined in § 483.120."). Those reports also found that only about half of individuals who were placed in nursing facilities for fewer than 90 days received the specialized services that they needed, based on PASRR Level II and Service Planning Team assessments that reflected their choices and preferences. Docket no. 249–3 at 23, 50 (Outcome Measure 1-13); see 42 C.F.R. § 483.120 (where PASRR process reveals that a nursing facility resident with IDD requires specialized services, "[t]he State must provide or arrange for the provision of specialized services"). More broadly, those reports found that roughly 70 percent of individuals in the Target Population [14] do not "receive specialized services with the frequency, intensity and duration necessary to meet their appropriately—identified needs, consistent with their informed choice." Docket no. 249–3 at 17, 46 (Outcome 2); see 42 C.F.R. § 483.440(a) ("Each client must receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart"; describing standard for "active treatment"). Those reports also found that 85 percent of individuals lack an Individual Service Plan under which they receive specialized services under the monitoring of their Service Planning Team. Docket no. 249–3 at 25, 29, 53, 57 (Outcome Measures 2-5 and 3-8); see 42 C.F.R. § 483.440 (c)-(f).

Defendants object to the ER reports in part on the grounds that the parties' Interim Agreement did not "purport to set the standard for what is required under federal law, and ... the negotiated terms go into far more detail than any provision of federal law under which Plaintiffs assert their claims." Docket no. 262 at 11. However, as noted above, at least some of the outcomes and outcome measures have close analogues in the federal statutes and regulations that form the bases for Plaintiffs' claims. This is not surprising, given that those outcomes and outcome measures were agreed upon by the parties as part of their effort at settlement. Moreover, to the extent that the parties dispute whether these outcomes and outcome measures embody standards for compliance with the relevant federal requirements, that dispute itself indicates the existence of common questions of law that weigh in favor of a finding of commonality. Finally, as discussed above, there is ample evidence in the record, aside from these three ER Reports, showing the existence of common questions of law and fact.

Defendants make a broader argument that class certification cannot be proper in this case because Plaintiffs challenge the integrity of determinations of medical need that are unique to each proposed class member. De-

14. As used in the parties' IA and the QSR Reports, the term "Target Population" is similar to the Plaintiffs' proposed class: "individuals with I 21 years of age or older who ... are in a nursing facility for more than 90 days; or are determined by a PASRR Level I screening to be in need of a PASRR Level II evaluation or are in a nursing facility for 90 days or less." Docket no. 180 at 4.

fendants particularly rely upon three cases in which appeals courts reversed pre–*Wal-Mart* class certification grants, and discussed the special difficulties that arise from certifying a classwide challenge to the integrity of individualized assessments within a government program: *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir.2012), *Jamie S. v. Milwaukee Pub. Sch*, 668 F.3d 481 (7th Cir.2012), and *D.L. v. District of Columbia*, 713 F.3d 120 (D.C.Cir.2013). In *M.D.*, the plaintiffs alleged violations of their "right to have placement decisions be made using clinical protocols to match a child to the most appropriate placement resource." *M.D.*, 675 F.3d at 835. In *Jamie S.* and *D.L.*, the plaintiffs challenged the integrity of state systems for identifying, locating, and evaluating children with disabilities, and for developing and providing "individualized educational program[s]," that, based on the individual needs of each child, provide them with special-education services that enable them to learn in the "least restrictive environment." *Jamie S.*, 668 F.3d at 486; *D.L.*, 713 F.3d at 122.

The courts in *M.D.* and *D.L.* discussed these difficulties in terms of the commonality requirement. The appeals courts in both cases found that the common questions articulated by the trial courts were not supported by the rigorous analysis required by *Wal-Mart. See M.D.*, 675 F.3d at 839; *D.L.*, 713 F.3d at 128. Specifically, rather than probing to determine whether the common questions are capable of classwide resolution, the trial courts found commonality because plaintiffs mounted "systemic" challenges to the government programs at issue and alleged a "pattern and practice" of discrimination. *M.D.*, 675 F.3d at 841–43; *D.L.*, 713 F.3d at 126. In contrast to those cases, this Court has found several common questions whose resolution will drive the resolution of the classwide claims regardless of the "systemic" nature of those claims. While "[m]ere allegations of systemic violations of the law ... will not automatically satisfy Rule 23(a)'s commonality requirement[,]" allegations of systemic violations of the law also do not make

preclude commonality or class certification. *D.L.*, 713 F.3d at 128 ("Again, none of this is to suggest that a class can never be certified in this kind of case."). Notably, on remand, the trial courts in both *M.D.* and *D.L.* addressed commonality for the first time post *Wal-Mart*, and both courts granted class certification. *M.D. v. Perry*, 294 F.R.D. 7 (S.D.Tex.2013); *D.L. v. District of Columbia*, 302 F.R.D. 1 (D.D.C.2013).

In *Jamie S.*, the court discussed this difficulty in terms of both commonality and the requirement that the class be ascertainable. *Jamie S.*, 668 F.3d at 495. Relying on the discussion of indefiniteness in *Jamie S.*, Defendants argue that the proposed class cannot be certified because the first criteria for class participation—Medicaid eligibility—is only assessed after the state has received a completed application for Medicaid. Docket no. 262 at 53–54. Therefore, an unknown number of individuals presumably exist who are Medicaid eligible but have never obtained a state assessment of their Medicaid eligibility. *See Jamie S.*, 668 F.3d at 496 ("class of unidentified but potentially IDEA-eligible disabled students is inherently too indefinite"); *Pfeffer v. HSA Retail, Inc.*, No. 11–cv–959, 2012 WL 1910034, at *3 (W.D.Tex. May 24, 2012) ("A court must be able to identify class members without resorting to intensive, individualized factual inquiries.") (internal quotation marks omitted). Defendants fail to acknowledge, however, that the proposed class does not include unidentified potentially Medicaid-eligible individuals with whom the state has had no contact. Rather, the proposed class definition is limited to Medicaid-eligible individuals who either (a) reside in nursing facilities, or (b) were screened for admission to a nursing facility. As Plaintiffs have pointed out, Defendants require that PASRR screeners determine the Medicaid eligibility of those to whom they administer screenings. Docket no. 276 at 49–50. Therefore, unlike the unidentified but potentially IDEA-eligible disabled students in *Jamie S.*, 668 F.3d at 496, this group is not only ascertainable, but has already been ascertained.[15]

---

**15.** It also does not defeat ascertainability that the proposed class includes those who "will in the future reside in nursing homes" and who "will

be[ ]or should be screened for admission to nursing facilities." *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 (5th Cir.2000) ("[i]n the case

In *Wal–Mart*, the commonality showing was not made and class certification was not appropriate because of a lack of evidence that the putative class members had suffered as the result of "a pattern or practice of discrimination." *Wal–Mart*, 564 U.S. at 352, 131 S.Ct. 2541. There is no such lack of evidence in this case. Rather, this is a case in which:

> Substantial evidence suggests that the State's policies and practices have created a systemic deficiency in the availability of community-based mental health services, and that that deficiency is the source of the harm alleged by all class members. The State's own reports, for example, demonstrate that there is a dearth of available community-based services .... They further show that this systemic condition "is a result of the way the State manages the system and is something that the State ... can control." *M.D. [v. Perry]*, 294 F.R.D. at 48 [ (S.D.Tex.2013) ] (finding that the States' policies and practices brought about the challenged systemic conditions). In addition, the evidence suggests a causal connection between that systemic condition and the harm experienced by all class members: a serious risk of unnecessary institutionalization, which includes a serious risk of continued unnecessary institutionalization.

*Kenneth R. ex rel. Tri–Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 267 (D.N.H.2013). Based on the evidence that Plaintiffs have produced, the Court finds that there are several questions of law and fact that are common to the class.

### C. Rule 23(a)(3): Typicality

■ Defendants also argue that Plaintiffs have failed to meet their burden of establishing that their claims are typical of those of the proposed class. The typicality requirement found at Fed. R. Civ. P. 23(a)(3) requires that the class representatives "possess the same interest and suffer the same injury" as the prospective class members. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The

Supreme Court has recognized that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" and that "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Defendants argue that typicality is impossible in this case because each Plaintiff has "a unique history regarding application to and participation in community-based waiver programs." Docket no. 262 at 42–43. Defendants complain that "none of the Named Plaintiffs here represents the interests of those proposed class members who cannot benefit from community placement, are not qualified for DADs' community and waiver services, or prefer not to live in the community." Docket no. 262 at 43–44.

The parties' arguments about typicality are in large part arguments about the appropriate level of generality at which to compare Plaintiffs to members of the proposed class. Plaintiffs argue for typicality because of characteristics they share with the proposed class members. For example, they have IDD, they are currently experiencing or are at risk for institutionalization, and they are entitled to appropriate screening and assessment to determine if they require a nursing facility level of care. Docket no. 249 at 47. Defendants, meanwhile, argue that these similarities are too general to bear on the typicality analysis, and that typicality is impossible in this context because the outcome for each Plaintiff depends upon that Plaintiffs' individual medical condition. Docket no. 262 at 43; *Thorpe v. District of Columbia*, 303 F.R.D. 120, 148 n. 61 (D.D.C.2014) ("There is no question that if the 'specific discriminatory practice' of 'lack of transition assistance' were defined any more narrowly, it is unlikely that named plaintiffs' claims would be typical."); *Deiter v. Microsoft Corp.*, 436 F.3d

at hand, the fact that the class includes unknown, unnamed future members also weighs in

favor of certification.").

461, 467 (4th Cir.2006) (affirming trial court's rejection of typicality argument that "was made at an unacceptably general level" where examination of "typicality at a more directly relevant level" revealed "meaningful differences between plaintiffs' claims and those of [class members].").

Thus, the assessment of typicality depends largely upon the Court's assessment of the most relevant level of generality at which to make the typicality inquiry. The Court is persuaded by Plaintiffs' argument that the relevant level of generality depends upon whether, considering the claims that Plaintiffs assert and the relief they seek, meaningful legal distinctions exist between the Plaintiffs and the proposed class members. *See, e.g., M.D. v. Perry*, 294 F.R.D. 7, 61 (S.D.Tex.2013) ("Particularities regarding [plaintiffs'] circumstances do not undermine the typicality of their claims because those particularities are not relevant to the very general constitutional claims Plaintiffs have chosen to assert here."). It is true that each Plaintiff's and class member's entitlement to services must depend upon a host of individualized medical determinations that, because they are inevitably unique, cannot be typical. For instance, each Plaintiff and class member must individually be assessed to determine whether they are eligible for Medicaid, whether they have IDD, whether they require a nursing facility level of care, whether and to what extent they are capable of living in a community-based setting, whether they desire community placement, whether and to what extent they are entitled to specific forms of specialized services, and so forth.

However, Plaintiffs do not seek to involve the Court in any of these determinations. Rather, Plaintiffs seek that the Court order particular changes to the system by which Defendants make those determinations and allocate community-based Medicaid services. Therefore, the atypical characteristics of individual Plaintiffs are not relevant to the Court's assessment of typicality because they do not shed light on meaningful differences between Plaintiffs and prospective class members. Plaintiffs have shown that they share the interests of the proposed class members in ensuring that Defendants use a system that complies with federal law to identify those who have IDD, those who require a nursing facility level of care, and those who require specialized services. Plaintiffs' interests in such a system are not adverse to the interests of prospective class members who cannot benefit from community placement, do not qualify for the HCS waiver program, or do not desire community placement. Plaintiffs have also alleged common injuries flowing from these deficiencies: they have been limited to receiving care in institutional settings, have not received active treatment while in institutional settings, and they have been segregated from community-based care. *See Falcon*, 457 U.S. at 156, 102 S.Ct. 2364 (class representatives must "possess the same interest and suffer the same injury as the class members.") (internal quotation marks omitted).

For these reasons, the Court concludes that Plaintiffs have demonstrated that, in all pertinent respects, they are typical of the proposed class. Furthermore, the Court concludes that the proposed class comprises an ascertainable group that is not too indefinite for class certification to be appropriate.

### D. Rule 23(a)(4): Adequacy of Representation

■ Defendants also argue that the class certification should be denied because the named Plaintiffs have not shown that they possess sufficient knowledge and understanding about the litigation to function as "adequate" class representatives within the meaning of Fed. R. Civ. P. 23(a)(4). This argument fails for several reasons.

■ The Fifth Circuit has identified a "generic standard" that applies to the adequacy requirement for class representatives, under which "the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir.2005). This standard is not "exacting"; it is sufficient that the class representatives "have a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants." *Hamil-*

*ton v. First Am. Title Ins. Co.,* 266 F.R.D. 153, 164 (N.D.Tex.2010), *vacated on other grounds,* 423 Fed.Appx. 425 (5th Cir.2011). "[C]lass representatives need not be legal scholars and are entitled to rely on counsel," provided that their knowledge about their case is not "limited to derivative knowledge acquired solely from counsel."[16] *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 483 & n. 18 (5th Cir.2001).

Defendants claim that Plaintiffs have failed to produce evidence to meet their adequacy burden. However, several of the named individual Plaintiffs have submitted declarations in which they demonstrate their knowledge about their role in this litigation and describe the outcomes they hope to achieve. Joseph Morell, in his declaration, briefly recites his medical and residential history, notes his status as a plaintiff and his desire to continue as a plaintiff, and notes that "I am now 72 years old and would very much like to finally have a home of my own in the community"; "I would also like to have the opportunity to do more activities in the community outside of the nursing home"; "I would like therapy to help me to learn how to safely walk since losing the use of one of my eyes"; "I would like to be evaluated for a piece of equipment to help me get around better"; and, finally, "[e]ven though I want and need these services, I still have not received them." Docket no. 264–1 at 1-3. Similarly, Johnny Kent and Thomas Johnson, in their declarations, recite their status as plaintiffs and their desire to continue as plaintiffs. They describe their medical and residential backgrounds, note their interest in community-based care, and note that they have not received several therapies and evaluations that have been recommended by their service planning teams which they believe would enable them to walk, talk, and live independently. Docket nos. 264–2 at 1-4; 264-3 at 1-3. Melvin Oatman's declaration describes his dissatisfaction with the care he currently receives in his nursing facility and notes his desire to "get out in the community, meet people and do things like other people do like eating, going to the park and getting a chance to go to movies[,]" and describes the absence of information about community living options or medical supports to facilitate a community transition. Docket no. 264–5 at 1-3. The mother and legal guardian of Plaintiff Maria Hernandez has submitted a declaration that affirms her desire that her daughter continue as a Plaintiff and chronicles her efforts to obtain a community placement for her daughter, her daughter's lengthy wait on the HCS waiver interest list, the isolation and lack of care that her daughter has experienced throughout her institutionalization, and the medical deterioration that her daughter has suffered as a result. Docket no. 264–4 at 1-6. These declarations describe unnecessary institutionalization, denials of specialized services, and other harms that, in many instances, predate the filing of this case by decades. The individual Plaintiffs may have cooperated with their counsel in developing the factual background of this case, but the individual Plaintiffs' knowledge about this case is not derived solely from their attorneys. Instead, it is derived from personal experience. Moreover, the two cases that Defendants primarily rely upon in support of their adequacy argument are both distinguishable. In both, the Fifth Circuit assessed adequacy in the context of claims subject to the Private Securities Litigation Reform Act, which " 'raises the standard adequacy threshold' with its 'requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation.' " *Feder,* 429 F.3d at 130 (quoting *Berger,* 257 F.3d at 483).

Class representatives "need not be legal scholars" or otherwise possess specialized expertise. *Berger,* 257 F.3d at 483. Nonetheless, the class representatives in this case have the benefit of being joined by organizational Plaintiffs whose directors do possess special

---

16. In a case relied upon by the Fifth Circuit in *Berger,* a trial court found a substantial question as to adequacy where the class representatives in a securities fraud case appeared to understand little more than "that they were involved in a bad business deal[,]" where the record revealed "an almost total lack of personal knowledge of their claims on the plaintiffs' part[,]" and where the court found that "the plaintiffs have abdicated their role to their attorneys, who now have become the *de facto* plaintiffs." *Kelley v. Mid–Am. Racing Stables, Inc.,* 139 F.R.D. 405, 410 (W.D.Okla.1990).

expertise in the subject matter of this litigation. *See* docket nos. 70-2 (Affidavit describing background of Coalition of Texans with Disabilities Executive Director Dennis Borel); 96 (Declaration describing the background of The Arc of Texas Executive Director Mike Bright). Defendants also argue that Plaintiffs cannot be adequate class representatives because they lack standing. The Court addresses Defendants' standing arguments separately in its Order denying Defendants' motions to dismiss, and rejects Defendants' standing-based adequacy argument for the reasons set forth in that Order.

The record does not suggest, and Defendants have not raised, any other basis for finding that Plaintiffs have failed to make the adequacy showing required by Rule 23(a)(4). As discussed above, the individual Plaintiffs' claims in this case are typical of the claims of the proposed class and "[t]he adequacy-of-representation requirement tend[s] to merge with the commonality and typicality criteria." *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The record does not reveal any divergence between the interests of the class representatives and those of the potential class members. *See Berger*, 257 F.3d at 479 ("[t]he adequacy inquiry also 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.' " (quoting *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231)). The record also does not reveal any shortcoming in the zeal or competence of class counsel. For these reasons, and based on the evidence in the record and discussed above, the Court rejects Defendants' adequacy arguments and finds that Plaintiffs have made the adequacy showing required by Rule 23(a)(4).

### E. Rule 23(b)(2): Propriety of Injunctive Relief Respecting the Class as a Whole

Finally, Defendants contend that class certification should not be granted because, contrary to Fed. R. Civ. P. 23(b)(2), no final relief can be crafted that would be "appropriate respecting the class as a whole[.]" This argument has much in common with the commonality and typicality dis-cussions above. Defendants argue that class-wide injunctive relief is not possible because such relief would require the Court to "determine which services and supports were appropriate for each individual class member based on their individual needs." Docket no. 262 at 49 (internal quotation marks omitted).

As above, however, the propriety of class-wide injunctive relief depends upon the level of generality at which Plaintiffs seek relief. Plaintiffs are not asking the Court to order individualized relief, but seek injunctions targeted at the deficiencies that they allege exists within Defendants' Medicaid service system. Plaintiffs ask that the Court order that Defendants reform their PASRR process to comply with federal law; that Defendants require that nursing facility residents be provided the full range of active treatment services set forth in 42 C.F.R. § 483.440, rather than permitting those services to be limited to those set forth at Section 483.440(a)(1); that Defendants require the assessment and notice required by 42 U.S.C. § 1396n(c)(2)(B) and (C) be provided at the time of nursing facility enrollment, rather than at the time of assessment for waiver services; and that Defendants revise the manner in which they fund and administer care for persons with IDD so as not to unduly rely upon institutional care rather than community-based care alternatives. Plaintiffs contend that, once reformed in accordance with such orders, Defendants' own administrative machinery—not the Court—will be capable of conducting assessments of individual medical needs and providing reasonably prompt specialized services to those with IDD without segregating those individuals in institutional settings in violation of Title II of the ADA or the Rehabilitation Act. This relief—seeking "to rectify [Defendants'] systemic failure to comply [with] specific statutory duties"—is not only an appropriate structure under Rule 23(b)(2) for relief in this case, but "fits the 'most frequent[ ] . . . vehicle for civil rights actions and other institutional reform cases that receive class action treatment." *D.L. v. District of Columbia*, 302 F.R.D. 1, 16 (D.D.C.2013) (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58–59 (3d. Cir.1994)). Therefore, the Court finds that Rule 23(b)(2) is satisfied.

### Conclusion and Order

For these reasons, the Court finds that Plaintiffs' Motion for Class Certification (docket no. 174) should be GRANTED.

IT IS HEREBY ORDERED that, pursuant to Federal Rule of Civil Procedure 23:

(1) The Court hereby certifies the following class:

All Medicaid-eligible persons over twenty-one years of age with intellectual or developmental disabilities or a related condition in Texas who currently or will in the future reside in nursing facilities, or who are being, will be, or should be screened for admission to nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.112 *et seq.*

a. For purposes of this class, "intellectual disabilities" has the same definition as that set forth at 42 C.F.R. § 483.102(b)(3).

b. For purposes of this class, "related condition" has the same definition as that set forth at 42 C.F.R. § 1010.

(2) The Court appoints the named Plaintiffs as class representatives.

(3) The Court appoints Disability Rights Texas, the Center for Public Representation, and the law firm of Sidley Austin LLP, as co-class counsel in this action.

IT IS SO ORDERED.